# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LUIS SANCHEZ,** | **1:12-CV-00428-LJO-SKO** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER RE MOTIONS TO DISMISS (DOCS. 38, 45)** |
| **v.** | |
| **CITY OF FRESNO, ASHLEY SWEARENGIN, MARK SCOTT, BRUCE RUDD, GREG BARFIELD, JERRY DYER, PHILLIP WEATERHS, MALCOLM DOUGHERTY, and DOES 1-100, inclusive,** | |
| **Defendants.** | |

## I. INTRODUCTION

Luis Sanchez, a homeless resident of the City of Fresno, alleges that his personal property, including property necessary for his survival, essential to his health, and of personal and emotional value, was seized and immediately destroyed as part of the City of Fresno's efforts to clean up homeless encampments in Downtown Fresno in late 2011 and early 2012. This case is but one of more than thirty similar cases filed by homeless individuals arising out of these cleanup activities, all of which have been consolidated for pretrial purposes, with the above-captioned matter serving as the lead case. *See* Doc. 27.

Before the Court for decision are separate, but partially overlapping, motions to dismiss Sanchez's first amended complaint ("FAC") pursuant to Fed. R. Civ. P. 12(b)(6), filed by (1) the City of Fresno (the "City"), Doc. 38-1, and (2) individual City employee Defendants Ashley Swearengin, Mark Scott, Bruce Rudd, Greg Barfield, Jerry Dyer, Phillip Weathers, and Malcolm Dougherty (collectively, "Individual Defendants"), Doc. 45. In the alternative, Defendants move for a more definite statement pursuant to Fed. R. Civ. P 12(e) and to strike certain allegations from the complaint pursuant to Fed. R.

Civ. P. 12(f). The motions address allegations that are contained in all consolidated complaints, and the Parties have stipulated that any ruling will be applicable to all related cases. Doc. 26 at 2. Plaintiff filed a consolidated opposition. Doc. 40. Defendants filed a consolidated reply. Doc. 43. The matter was originally set for hearing on December 6, 2012, but given the voluminous materials submitted to the Court, the hearing was vacated. Doc. 44. After reviewing the submissions of the parties in light of the entire record, the Court does not believe oral argument is necessary to aid resolution of the disputes, and hereby rules on the papers pursuant to Local Rule 230(g).

## II. BACKGROUND.

**A.     The *Kincaid* Case.**[1]

This case cannot be understood in a vacuum, as the City of Fresno and its homeless population have a history of conflict and litigation. In October 2006, a group of homeless individuals residing in the City of Fresno filed a class action complaint against the City and various other defendants, challenging cleanup operations conducted over the course of more than a year in which defendants implemented a policy of seizing and immediately destroying personal property belonging to homeless individuals. *See Kincaid v. city of Fresno,* 244 F.R.D. 597, 598 (E.D. Cal. 2007).

In late October 2006, the district court found plaintiffs were likely to succeed on their claims that defendants' conduct violateed the Fourth, Fifth and Fourteenth Amendments of the United States Constitution, as well as Article 1, Section 13 (unlawful searches and seizures) and Article 1, Section 7(A) (due process) of the California Constitution. *Kincaid*, 1:06-cv-01445 OWW SMS, Doc. 34 at 13-14. A preliminary injunction was entered, barring Defendants from "immediately destroying the property of homeless persons during protective sweeps, activities to remove homeless persons from temporary shelter sites, or other activities to seize the personal property of homeless persons, without

---

[1] The Court takes judicial notice of the cited documents from *Kincaid. See U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue").

providing constitutionally adequate notice and meaningful opportunity to be heard concerning the seizure and destruction of such personal property." *Id*. at 14.

On August 14, 2007, plaintiffs' motion for class certification was granted, permitting the case to proceed on behalf of a class of "[a]ll persons in the City of Fresno who were or are homeless, without residence, after October 17, 2003, and whose personal belongings have been unlawfully taken and destroyed in a sweep, raid or cleanup by any of the Defendants." *Kincaid*, Doc. 147. The case proceeded through several rounds of dispositive motions toward trial, which was set for early June 2008. On the eve of trial, the parties reached a settlement, which was eventually approved by the district court. *Kincaid*, Docs. 321 & 323. The City agreed to pay $1,400,000[2] to the class, to be allocated by a well-known local homeless advocate in the form of small cash allowances to be paid directly to class members and additional living allowances to be paid to third parties to cover housing expenses. *Kincaid*, Doc. 321-2 at 3.1.1 (City Settlement), Doc. 321-4 (Settlement Plan). The City also agreed to pay $850,000 in attorney's fees and costs to class counsel. *Kincaid*, Doc. 321-2 at 3.1.1.

In addition, the City agreed as follows:

> The City of Fresno Defendant and all agents and employees of the City of Fresno will, for a period of not less than 5 years from the day this settlement is approved by the Court, comply with the provisions of Fresno Administrative Order No. 6-23 []. Before making any change in Administrative order 6-23 during this 5 year period, the City of Fresno Defendants will meet and confer with counsel for Plaintiffs and the Plaintiff class with respect to any such change and, following that meet and confer, seek leave of Court, and absent exigent circumstances, give Plaintiffs' counsel no less [sic] than 30 days notice of its intention to seek such leave and of the terms of the change. If exigent circumstances arise, the City of Fresno Defendants will give as much notice as reasonably possible of any proposed change and attempt in good faith to resolve any issue giving rise to such circumstances. The Court shall retain jurisdiction of this matter to resolve any dispute that may arise with respect to compliance with or changes to Administrative Order 6-23.

*Id*. at 3.1.2.[3]

Fresno Administrative Order ("AO") 6-23, which is discussed in greater detail below, sets forth

---

[2] Other defendants agreed to pay smaller amounts. *See, e.g.*, *Kincaid*, Doc. 321-3 (CalTrans Settlement)
[3] The Settlement Agreement was approved on July 25, 2008. *Kincaid*, Doc. 323. Accordingly, the five-year period expires July 25, 2013.

detailed procedures relating to the clean up of materials in and around areas in which individuals have erected temporary shelters. *See Kincaid*, Doc. 321-5 (AO 6-23). Absent any immediate threats to health or safety, specific forms of notice must be required prior to any clean up. In addition, "materials of apparent value which appear to be the property of any individual" may not be destroyed. *Id.* at I.A(3). AO 6-23 acknowledges that "the fact that property is unattended does not necessarily mean that it has been discarded," and directs that "[r]easonable doubt about whether property is 'trash or debris' or valuable property should be resolved in favor of the conclusion that the property is valuable and should not be discarded." *Id.* at I.A(4).

**B.     The Present Allegations.**[4]

Beginning in or about September 2011, Defendants set in motion a plan to eradicate a number of small shelters used by homeless individuals in an area in the City of Fresno known generally as "south of Ventura Street." FAC ¶ 20. It is alleged that Defendants knew these shelters were being used by Plaintiff and the Plaintiffs in related actions as "homes to provide not only protection from the elements but also contained personal property of great personal value and significance to both their physical and emotional health, including personal property such as medications, photographs, and important personal effects from family and loved ones...." FAC ¶ 9. Plaintiff further alleges that Defendants knew that Plaintiff and others in Plaintiff's position had no alternative shelter or means of protection from the elements nor any other means of keeping their personal property safe, and that no safe shelter was available to Plaintiff or to large numbers of other homeless residents, including many Plaintiffs whose cases have been consolidated with this one. *Id.*

Nonetheless, Defendants planned, directed, and implemented the demolition of these shelters and their contents, even though Defendants were advised that the demolition involved the destruction of

---

[4] These background facts are drawn exclusively from the FAC, the truth of which the court must assume for purposes of at Rule 12(b)(6) motion to dismiss. Plaintiff has offered additional factual material, but has not offered any justification for its consideration at this stage of the litigation. *See* Declaration of Paul Alexander, Doc. 42. Accordingly, none of this extra-record evidence will be considered.

valuable personal property and the demolition of entire tents and shelters. *See id*. It is alleged that Defendants engaged in this conduct "[d]espite the extreme weather conditions" prevailing at the time, and "know or should reasonably know that their conduct threatened plaintiff's continued survival." FAC ¶ 22. According to the FAC, Defendants failed to provide adequate notice of their intent to seize and destroy Plaintiff's property, nor any means of retrieving seized property. FAC ¶ 21. Plaintiff concedes that at the time his property was destroyed, he "had left his shelter temporarily for a brief time," but "had in no way either abandoned his shelter or the contents of his shelter." *Id*. When Plaintiff returned to the area, he witnessed Defendants demolishing other property in the area. *Id*.

## III. DISCUSSION

**A.     Motions to Dismiss.**

    **1.     Standard of Decision.**

    A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens,* 546 F.3d 580, 588 (9th Cir. 2008).

    To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at

556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Thus, "bare assertions ... amount[ing] to nothing more than a 'formulaic recitation of the elements'... are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. A court should "dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Ass'n v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). In practice, "a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## 2.    Threshold Issue: Relationship of this Case to *Kincaid*.

Among other things, Plaintiff asserts that he has a contractual right to enforce the benefits and protections of the *Kincaid* Settlement Agreement and the corresponding court Order approving it. The City correctly notes that in the approval Order, the district court retained jurisdiction to hear any disputes over implementation of the Settlement Agreement, including any disputes over the City's compliance with AO 6-23. However, nothing in the Settlement Agreement or the Order approving it requires any such issues to be raised within the now-closed *Kincaid* case, and nothing precludes or waives Plaintiff's right to file a separate lawsuit challenging the City's post-settlement conduct.

Defendants point to no such language and in fact do not seek dismissal on this ground. The matter seems to be raised for no particular procedural reason at this point in the litigation, as there is no dispute that this Court has jurisdiction to hear most (if not all) of the claims raised in the present Complaint. The Court will therefore ignore this extraneous reference.

### 3.   Federal (42 U.S.C. § 1983) Claims.

#### a.   City's Motion to Dismiss.

##### (1)   Municipal Liability Under *Monell*.

Defendants move to dismiss the federal civil rights claims against the City, arguing that Plaintiff has failed to satisfy the requirements of *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), which provides that a municipality cannot be liable under § 1983 on a *respondeat superior* theory (i.e., simply because it employs someone who deprives another of constitutional rights). Rather, liability only attaches where the municipality itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694. Therefore, municipal liability in a § 1983 case may be premised upon: (1) an official policy; (2) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the act of an "official whose acts fairly represent official policy such that the challenged action constituted official policy"; or (4) where "an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).

##### (a)   Official Policy.

As part of the *Kincaid* settlement, the City developed AO 6-23 as a formal policy regarding the cleanup of shelters erected by homeless individuals and any belongings found in and around such shelters. AO 6-23 details how the City will provide notice regarding planned cleanup of such structures and belongings, and defines "trash and debris" to include "property that appears to have been discarded

7

by its owner." AO 6-23 at I.A(4). While the AO does not prohibit the City from disposing of such "trash and debris," it specifically prohibits the destruction of "any materials of apparent value which appear to be the personal property of any individual." AO 6-23 at I.A(3). The AO also specifies that "the fact that property is unattended does not necessarily mean that it has been discarded" and that "reasonable doubt about whether property is 'trash or debris' or valuable property should be resolved in favor of the conclusion that the property is valuable and has not been discarded." AO 6-23 at I.A(4).

The FAC alleges that individual agents of the City acted in <u>contravention</u> of AO 6-23. This is indisputably insufficient to trigger municipal liability under *Monell* and Plaintiff offers no other basis upon which this form of liability could exist. Accordingly, City Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to any *Monell* claim based on an official policy.

### (b)   Longstanding Practice or Custom.

Defendant argues that the FAC fails to allege sufficiently *Monell* liability based upon a longstanding practice or custom, because the complaint concerns only one episode of purportedly unconstitutional conduct: the cleanup that resulted in the demolition of Plaintiff's shelter in November 2011. "A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom." *Christine v. Iopa*, 175 F.3d 1231, 1235 (9th Cir. 1999).

> Municipal liability is only appropriate where a plaintiff has shown that a constitutional deprivation was directly caused by a municipal policy. *Oviatt v. Pearce,* 954 F.2d 1470, 1477-78 (9th Cir.1992). Such a policy must result from a deliberate choice made by a policy-making official, *id.,* and may be inferred from widespread practices or "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded," *Gillette v. Delmore,* 979 F.2d 1342, 1349 (9th Cir.1992). "A plaintiff cannot prove the existence of a *municipal* policy or custom based solely on the occurrence of a single incident or unconstitutional action by a non-policymaking employee." *Davis v. City of Ellensburg,* 869 F.2d 1230, 1233 (9th Cir.1989).

*Nadell v. Las Vegas Metro. Police Dept.,* 268 F.3d 924, 929 (9th Cir. 2001), abrogated on other grounds as recognized in *Beck v. City of Upland*, 527 F.3d 853, 862 n. 8 (9th Cir. 2008).

8

A longstanding practice or custom is one that is so "persistent and widespread" that it constitutes a "permanent and well settled" governmental policy. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*. (emphasis added). The line between "isolated or sporadic incidents" and "persistent and widespread conduct" is not clearly delineated, although where more than a few incidents are alleged, the determination appears to require a fully-developed factual record. *Compare Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989) (single incident of excessive force inadequate to establish liability); *Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (two incidents insufficient) with *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (triable issue of fact existed as to whether Seattle had an unconstitutional policy or custom of suppressing certain political speech based on the testimony of several individuals that their entry to a particular area was permitted by police only after they removed offending buttons and stickers, coupled with the testimony of the officer in charge that the City would not permit "demonstrations" in the area); *see also Jarbo v. County of Orange*, 2010 WL 3584440, *9-13 (C.D. Cal. Aug. 30, 2010) (reviewing circumstances in which *Monell* custom/practice claims were permitted past summary judgment).

Here, the FAC alleges generally that the demolition of Plaintiff's shelter was "part of a demolition of all homeless encampments in the areas of Santa Fe, H Street, G Street, F Street, E Street, San Benito Street, Santa Clara Street, Ventura Street, Golden State, and surrounding areas." FAC ¶ 21. Standing on its own, this suggests the existence of a custom or practice, but lacks the specificity required to determine whether the complaint plausibly alleges a "persistent and widespread" course of conduct. The Court takes judicial notice of the fact that this cleanup operation resulted in multiple individual lawsuits, which have been consolidated for pretrial purposes with the above-captioned matter. The original complaints filed in these cases allege cleanups occurred on multiple days, from as early as late

9

October 2011 through mid-December 2011. However, the Court is not aware of any caselaw that permits consideration of the content of related/consolidated complaints to satisfy the applicable pleading requirements. Plaintiff must provide sufficient detail in his own complaint to satisfy the requirements of *Monell* and *Twombly/Iqbal*.

Accordingly, City Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND as to any *Monell* claim based on a longstanding practice or custom.

### (c)  Official Policymaker.[5]

*Monell* liability may also attach where "the individual who committed the constitutional tort was an official with final policy-making authority and [] the challenged action itself thus constituted an act of official governmental policy…." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). "Whether a particular official has final policy-making authority is a question of state law." *Id.*

The FAC alleges that high-ranking policymakers within City government, including the Mayor, the City Manager, the Assistant City Manager, the Chief of Police, and the Homeless Prevention and Policy Manager personally approved of and or directed others to implement a policy very different from that set forth in AO 6-23, one that called for "the demolition of shelters and personal property of great importance to plaintiff and others like him with knowledge of the devastating personal damage caused by these actions." FAC ¶ 9; *see also* FAC ¶¶ 10-13.[6] For purposes of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), these allegations must be assumed true.[7]

Defendants argue that none of the named individual City officials possesses the authority to set

---

[5] The final mechanism for *Monell* liability, delegation or ratification, is not alleged, so is not discussed herein.

[6] Plaintiff has offered for consideration interrogatory responses in which the named City officials purportedly admit that they "generally authorized, ordered, directed, or participated" in the demolitions of Plaintiff's property, but offers no basis upon which such extra-record evidence may be considered in the context of a 12(b)(6) motion to dismiss. They will not be considered.

[7] Plaintiff cites a number of cases that once stood for the proposition that "a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss even if based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *See Haddox v. City of Fresno*, 2008 WL 53244 (E.D. Cal. Jan. 2, 2008) (citing *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 624 (9th Cir. 1988)), but this case and the others cited by Plaintiffs predate *Iqbal*. It is the more demanding pleading standard set forth in *Iqbal* that applies here.

City policy regarding the cleanup of homeless encampments because of the nature of the Settlement

Agreement in *Kincaid*, which gave rise to the passage of AO 6-23. As part of the Settlement Agreement,

executed by the City of Fresno, its then Mayor Alan Autry, and several other City Officials, the City

agreed that for a period of five years following court approval of the Settlement, the City, as well as all

of its agents and employees, must comply with the provisions of AO 6-23 and must not modify AO 6-23

without leave of Court. Settlement Agreement at 3.1.2. The *Kincaid* court approved the Settlement on

July 25, 2008.

There seems to be little doubt that the City would be in breach of the Settlement Agreement and

the court Order approving it if the City or any of its agents or officers adopted a formal policy contrary

to AO 6-23 within the five-year window, which will not expire until July 25, 2013. However, does this

necessarily mean that the Mayor lacks authority to do so? Under Section 400 of the Fresno City Charter,

the "executive power of the City is vested in the office of the Mayor," who "shall be the Chief Executive

Officer of the City..." and "shall be responsible ... for the proper and efficient administration of all

affairs of the City." Charter of the City of Fresno, Art. IV, § 400. Further, the City Manager "shall

exercise control over all departments, offices and agencies under his or her jurisdiction." *Id*. at Art. VII,

§ 705.

The key question in determining whether a person is "a final policymaker" is whether "he or she

[is] in a position of authority such that a final decision by that person may appropriately be attributed to

the Municipality." *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004). "Municipal liability attaches only

where the decisionmaker possesses final authority to establish municipal policy with respect to the

action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Whether the Mayor and/or

the City Manger had power to set policy unilaterally on the subject of homeless encampment cleanup

would be easier to resolve if the requirement of Court approval prior to modification of AO 6-23 had

been embodied in AO 6-23 itself or in any other City Ordinance or Order.[8] As it stands, it is debatable whether the court Order approving the Settlement actually modifies the Mayor's otherwise obvious power to set policy regarding garbage collection and City cleanup activities, or whether the Mayor may still exercise that power despite the fact that doing so may violate a federal court Order. The Court is unable to conclude at this stage of the litigation that the Mayor and/or other Individual Defendants were not final policymakers. Further factual development appears necessary to resolve this matter. Accordingly, Defendants motion to dismiss any *Monell* claim based upon the act of a final policymaker is DENIED.

### (2)      Fifth Amendment Due Process Claim.

The caption of the Second Claim for Relief alleges "denial of [the] Constitutional Right to Life, Liberty and Due Process of Law [based upon] the Fifth Amendment and 42 U.S.C. § 1983." FAC at 21. It is well established that Plaintiff cannot advance a Fifth Amendment due process claim against a local government entity or its employees, because the due process and equal protection components of the Fifth Amendment apply only to the federal government. *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) (dismissing Fifth Amendment due process and equal protection claims brought against the City of Los Angeles because defendants were not federal actors); *see also Low v. City of Sacramento*, 2010 WL 3714993 (E.D. Cal. Sept. 17, 2010).

Plaintiff does not dispute the essence of these holdings but nevertheless insists that he has stated a Fifth Amendment due process claim. The only authority cited by Plaintiff that even arguably supports this contention is the following quote from justice Stevens' concurrence in *Chavez v. Martinez*, 538 U.S. 760, 788 (2003):

---

[8] Plaintiff argues that the City is "miss[ing] the mark" by even arguing that the individually named City Officers do not have authority to modify AO 6-23, because Plaintiff is not alleging that AO 6-23 was amended. Rather, Plaintiff characterizes the FAC's allegations as challenging the City's "develop[ment] and execut[tion] [of] a separate and distinct policy, which was to destroy the makeshift homes of the homeless and seize and immediately destroy most of the personal property within or around those homes." Doc. 40 at 11. This ignores the reality that any such policy would be a de-facto, unilateral amendment to AO 6-23 subject to the terms of the Settlement Agreement**.**

> By its terms, the Fifth Amendment itself has no application to the States. It is, however, one source of the protections against state actions that deprive individuals of rights "implicit in the concept of ordered liberty" that the Fourteenth Amendment guarantees. Indeed, as I pointed out in my dissent in *Oregon v. Elstad*, 470 U.S. 298, 371 (1985), it is the most specific provision in the Bill of Rights "that protects all citizens from the kind of custodial interrogation that was once employed by the Star Chamber, by 'the Germans of the 1930's and early 1940's,' and by some of our own police departments only a few decades ago." Whenever it occurs, as it did here, official interrogation of that character is a classic example of a violation of a constitutional right "implicit in the concept of ordered liberty."

(Footnotes omitted.) Plaintiff fails to acknowledge that *Chavez* concerned the self-incrimination clause of the Fifth Amendment, which has undeniably been made applicable to the States in full through incorporation by the Due Process Clause of the Fourteenth Amendment. *See id*. at 790. With this in mind, the Court is unconvinced that this non-binding concurrence should open the door to a Fifth Amendment due process claim against a local government entity in this case.

Defendants' motion to dismiss any claim based upon the Fifth Amendment due process clause is GRANTED WITHOUT LEAVE TO AMEND, as amendment could not possibly cure the defect described above.

### (3)   Fourteenth Amendment Due Process.

Although the caption of the Second Claim for Relief invokes only the Fifth Amendment, the text of that claim alleges that Defendants' policies, practices, and conduct violate plaintiff's right to life, liberty and due process of law under the Fifth and Fourteenth Amendments." FAC ¶ 36.

The Fourteenth Amendment bars "any State [from] depriv [ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment encompasses two types of protections: substantive rights (substantive due process) and procedural fairness (procedural due process). *See Zinermon v. Burch*, 494 U.S. 113, 125-28 (1990).

13

(a)     **Substantive Due Process.**

Under substantive due process jurisprudence, the Fourteenth Amendment "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). In this conception, due process encompasses certain "fundamental" rights. *Reno v. Flores*, 507 U.S. 292, 301–302 (1993). Substantive due process also "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with the rights implicit in the concept of ordered liberty." *Corales v. Bennett,* 567 F.3d 554, 568 (9th Cir. 2009) (internal citations and quotations omitted). The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).

Defendants move to dismiss any substantive due process claims in the FAC on the ground that the facts alleged in support of the claim are more appropriately evaluated under the construct of the Fourth Amendment. Doc. 38-1 at 10. Where government behavior is governed by a specific constitutional amendment, claims under section 1983 alleging unlawful government action must be evaluated under that specific constitutional provision, rather than under the rubric of "substantive due process." *Graham v. Conner*, 490 U.S. 386, 395 (1989); *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *see also Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) (refusing to acknowledge a Fourteenth Amendment liberty interest in entering a polling place wearing political buttons, instead evaluating arrest for such conduct under the Fourth Amendment). Defendants maintain that Plaintiff has failed to explain how the alleged violation of his due process rights is any different from the alleged violation of his Fourth Amendment rights. Doc. 38-1 at 10.

The key inquiry is whether the more particular Amendment (in this case the Fourth) "provides an explicit textual source of constitutional protection against a particular sort of government behavior."

*Albright*, 510 U.S. at 273 (internal citations and quotations omitted). Here, some of the government conduct alleged in the FAC arguably falls within the purview of the Fourth Amendment's prohibition against unreasonable searches and seizures. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027-30 (9th Cir. 2012) (holding that the City's immediate destruction of homeless individuals' personal property constituted an unreasonable seizure under the Fourth Amendment). It is therefore appropriate to evaluate that same conduct (the alleged seizure) under the Fourth Amendment, rather than the Fourteenth Amendment. However, the allegations in the FAC do not stop at the seizure itself.

Plaintiff alleges that Defendants violated his "fundamental right to life, liberty and property by creating a policy and plan for the homeless plaintiffs that physically threatened their ability to live."[9] . For example, the FAC alleges:

> 22. Despite the extreme weather conditions, and despite the fact that they have destroyed plaintiff's shelter and property essential to protection from the elements, defendants continue this custom, practice and policy. Defendants know or should reasonably know that their conduct threatened plaintiff's continued survival, but nonetheless continued their conduct in a manner that has created substantial risk to his ability to continue to survive and is shocking to the conscience...

> 24. ... Defendants timed the demolitions and destruction of property to occur at the onset of the winter months that would bring cold and freezing temperatures, rain, and other difficult physical conditions. Defendants knew or should reasonably have known that their conduct would have a substantial harmful effect on homeless residents because they engaged in this conduct at a time when those residents were particularly vulnerable and when that conduct would cause substantial physical and emotional damage to plaintiff and create a substantial and ongoing threat to plaintiff's right to life and liberty. As a further direct and proximate result of defendants' conduct, plaintiff has been left without any shelter or adequate clothing or other protection from the elements, and has suffered adverse physical and mental health effects as a result of that conduct. Plaintiff's right to liberty and life is substantially threatened and jeopardized by defendants' conduct.

FAC ¶ 22.

"The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright*, 510 U.S. at 272. The Fourteenth Amendment's due process clause "provides heightened protection against government

---

[9] In his opposition, Plaintiff asserts that at least one homeless individual whose shelter was destroyed during the cleanups died in December 2011, while sleeping unsheltered on the streets of Fresno. Doc. 40 at 16 n.6. Plaintiff does not explain, however, how this anecdotal information, no matter how tragic, may be considered in evaluating a motion to dismiss his own claims against the Defendants.

interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720 (1997). Courts are instructed to resist the temptation to augment the substantive reach of the Fourteenth Amendment, "particularly if it requires redefining the category of rights deemed to be fundamental." *Bowers v. Hardwick*, 487 U.S. 186, 195 (1986), overruled on other grounds, *Lawrence v. Texas*, 539 U.S. 558 (2003).

There is no fundamental right to housing, *Lindsey v. Normet*, 405 U.S. 56 (1972), but this case does not merely address Plaintiff's lack of access to shelter. The FAC's allegations arguably trigger application of a series of cases that provide for liability under substantive due process where a state or local official acts to place an individual in a situation of known danger with deliberate indifference to their personal, physical safety. This doctrine is spelled out in detail in *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006).[10] The plaintiff in *Kennedy* contacted Ridgefield police to report that a thirteen year-old neighbor had molested her nine year-old daughter. At the time of the report, the plaintiff warned officers that the neighbor had violent tendencies. *Id.* at 1057. The police assured plaintiff that she would be given notice prior to any police contact with the neighbor's family about the allegations. *Id.* at 1058. However, in contravention of this promise, the neighbor was informed of the allegations shortly before officers warned plaintiff. *Id.* Later that night, the neighbor broke into plaintiff's home, shot plaintiff, and fatally shot plaintiff's husband. *Id.* Plaintiff alleged that the involved officer violated her Fourteenth Amendment right to substantive due process by placing her in a known danger with deliberate indifference to her personal physical safety. The Ninth Circuit reviewed the applicable standard:

> It is well established that the Constitution protects a citizen's liberty interest in her own bodily security. *See, e.g., Ingraham v. Wright,* 430 U.S. 651, 673-74 (1977); *Wood v. Ostrander,* 879 F.2d 583, 589 (9th Cir.1989). It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action "affirmatively place[s] the plaintiff in a position of danger," that is, where state action creates or exposes an

---

[10] The parties do not explore the Ninth Circuit's substantive due process jurisprudence in any detail and ignore *Kennedy*.

individual to a danger which he or she would not have otherwise faced. *DeShaney v. Winnebago County Dep't of Soc. Serv.,* 489 U.S. 189, 197, 201 (1989); *Wood,* 879 F.2d at 589-90.

This circuit first recognized such "danger creation" liability in *Wood v. Ostrander,* 879 F.2d 583 (9th Cir. 1989). In *Wood,* a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer's actions allegedly left Wood, a female passenger, stranded late at night in a known high-crime area. Subsequently, Wood accepted a ride from a passing car and was raped. This court held that Wood could claim § 1983 liability, since a jury presented with the above facts could find "that [the trooper] acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." *Id.* at 588.

Since *Wood,* this circuit has held state officials liable, in a variety of circumstances, for their roles in creating or exposing individuals to danger they otherwise would not have faced. *See L.W. v. Grubbs,* 974 F.2d 119 (9th Cir. 1992) ("*Grubbs* ") (holding state employees could be liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium-security custodial institution with a known, violent sex-offender); *Penilla v. City of Huntington Park,* 115 F.3d 707 (9th Cir. 1997) (holding as viable a state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house); *Munger v. City of Glasgow,* 227 F.3d 1082 (9th Cir. 2000) (holding police officers could be held liable for the hypothermia death of a visibly drunk patron after ejecting him from a bar on a bitterly cold night). These cases clearly establish that state actors may be held liable "where they affirmatively place an individual in danger," *Munger,* 227 F.3d at 1086, by acting with "deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it," *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir. 1996) ("*Grubbs II* ").

*Ridgefield*, 439 F.3d at 1061-62 (footnotes omitted). *Kennedy* delineated a two-part test, requiring:

(1) official (state) action that affirmatively placed an individual in danger; and (2) deliberate indifference

to that danger.

"In examining whether an officer affirmatively places an individual in danger, [a court does] not

look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may

not have been available to the individual. Instead, [the court must] examine whether the officer left the

person in a situation that was more dangerous than the one in which they found him." *Id*. at 1062

(internal citations and quotations omitted). Evaluating the officer's motion for summary judgment, the

Ninth Circuit in *Kennedy* found that by informing the neighbor of the allegations without first warning

plaintiff, the officer involved "affirmatively created an actual, particularized danger [plaintiff] would not otherwise have faced." *Id*. at 1063.

As to the second prong, a court "must decide the related issues of whether the danger to which the defendant exposed plaintiff "was known or obvious, and whether [defendant] acted with deliberate indifference to it. *Id*. at 1064. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan County v. Brown,* 520 U.S. 397, 410 (1997). Because plaintiff warned the officer repeatedly about the neighbor's violent tendencies and specifically requested notice, his decision to proceed without such notice was sufficient evidence of deliberate indifference for purposes of summary judgment. *Kennedy*, 439 F.3d at 1064-65.

Here, the FAC contains enough facts to support plausibly a substantive due process claim based upon the "danger creation" doctrine. It is alleged that Defendants timed the demolitions of "plaintiff's shelter and property essential to protection from the elements" to occur at "the onset of the winter months that would bring cold and freezing temperatures, rain, and other difficult physical conditions." FAC ¶¶ 22, 24. It is further alleged that "Defendants kn[ew] or should reasonably [have known] that their conduct threatened plaintiff's continued survival, but nonetheless continued their conduct in a manner that has created substantial risk to his ability to continue to survive and is shocking to the conscience..." FAC ¶ 22.

Accordingly, Defendants' motion to dismiss Plaintiff's substantive due process claim is DENIED.

### (a)   Procedural Due Process

A "procedural due process claim hinges on proof of two elements: (1) a protectible liberty or property interest; and (2) a denial of adequate procedural protections." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005). If there has ever been any doubt in this Circuit that a homeless

person's unabandoned possessions are "property" within the meaning of the Fourteenth Amendment, that doubt was put to rest by the Ninth Circuit's September 2012 Decision in *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012). That case concerned the City of Los Angeles' practice of seizing and immediately destroying the personal possessions of homeless individuals temporary left on public sidewalks in the "Skid Row" district of Los Angeles. In affirming the issuance of an injunction prohibiting the City's practice, the Ninth Circuit acknowledged that both the Fourth and Fourteenth Amendments (procedural due process) protect "homeless persons from government seizure and summary destruction of their unabandoned, but momentarily unattended, personal property." *Id*. at 1024.

The FAC alleges that Defendants "provided no adequate notice of their intent to seize and desroy plaintiff's property nor any means of retrieving property that was seized." FAC ¶ 21. The motion to dismiss does not directly address the potential for a procedural due process claim. To the extent Defendants have moved to dismiss any Fourteenth Amendment Due Process claim raised in the FAC, that motion is DENIED.

### (4)   Takings Claims.

The Third Claim for Relief alleges that the City took Plaintiff's property without just compensation in violation of the "Fifth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983, and Article 1, § 19 of the California Constitution." FAC ¶ 39. The Fifth Amendment to the U.S. Constitution precludes the taking of private property for public use without just compensation. Article 1, § 19 of the California Constitution provides similar protections.[11]

---

[11] The text of Article I, § 19 provides in pertinent part:

> (a) Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner. The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation.

> (b) The State and local governments are prohibited from acquiring by eminent domain an owner-occupied residence for the purpose of conveying it to a private person.

### (a)       Ripeness of Federal Takings Claim.

Here, the City moves to dismiss the federal takings claim on ripeness grounds based upon Plaintiff's failure to exhaust available remedies in state court. Doc. 38-1 at 10. Ripeness is a threshold jurisdictional issue. "Article III of the Constitution limits the jurisdiction of federal courts to consideration of actual cases and controversies, and federal courts are not permitted to render advisory opinions." *W. Linn Corporate Park L.L.C. v. City of W. Linn*, 534 F.3d 1091, 1099 (9th Cir. 2008) (internal citations omitted). "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed." *Id*. In *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court held that a land owner's Fifth Amendment takings claim against a local government's regulatory taking is not ripe until the landowner has availed himself of all the administrative remedies through which the government might reach a final decision regarding the regulations that effect the taking, <u>and</u> any state judicial remedies for determining or awarding just compensation. *Id*. at 186.

> The first condition, which has come to be known as "prong-one ripeness," requires a claimant to utilize available administrative mechanisms, such as seeking variances from overly-restrictive or confiscatory zoning ordinances, so that a federal court can assess the scope of the regulatory taking. *Id*. at 190–91. The second condition ("prong-two ripeness") is based on the principle that "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Id*. at 194. Consequently, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the [federal] Just Compensation Clause until it has used the procedure and been denied just compensation." *Id*. at 195.

*W. Linn*, 543 F.3d at 1100.

*Williamson* arose in the context of an alleged regulatory taking, but the Ninth Circuit applies a

---

(c) Subdivision (b) of this section does not apply when State or local government exercises the power of eminent domain for the purpose of protecting public health and safety; preventing serious, repeated criminal activity; responding to an emergency; or remedying environmental contamination that poses a threat to public health and safety.

modified *Williamson* analysis in cases of physical takings.[12] *Id*. Applying this modified analysis in the context of California law, the "prong-one ripeness" requirement disappears, as such considerations are "automatically satisfied at the time of the physical taking," because "where there has been a physical invasion, the taking occurs at once, and nothing the [government entity] can do or say after that point will change that fact." *Daniel v. County of Santa Barbara*, 288 F.3d 375, 382 (9th Cir. 2002) (internal quotations and citations omitted). The only pertinent inquiry is prong two. So, "as in a regulatory takings case, the property owner must have sought compensation for the alleged taking through available state procedures." *Id*.[13] Here, it is undisputed that Plaintiff has not availed himself of any state procedures regarding compensation for his property. This requires the dismissal of Plaintiff's federal takings claim.

### (b)      State Takings Claim/Supplemental Jurisdiction.

Plaintiff does not argue against the above conclusion. Instead, he points to *Picard v. Bay Area Reg'l Transit Dist*., 823 F. Supp. 1519, 1526 (N.D. Cal. 1993), where the district court exercised supplemental jurisdiction over a state law takings claim, despite concluding that the federal takings claim was unripe. Defendants maintain that this argument is a "fallacy" because no inverse condemnation claim has been included in the FAC. Defendants are correct that the caption for the FAC's Third Claim for Relief omits any mention of the California Constitution. FAC at 21. However, the body of the claim, which consists of only four paragraphs, does allege that Defendants' conduct violated Article 1, § 19 of the California Constitution. This is an invocation of the California Constitutional protection against the taking of private property for public use without just compensation.

---

[12] Although the parties have not discussed how the destruction of Plaintiff's property should be classified, it hardly seems appropriate to call it a "regulatory taking" as FAC alleges the destruction took place in contravention of existing regulations. Rather, the clean-up activities amount to the physical possession of Plaintiff's property. "Although historically stated in terms of real property, inverse condemnation also has been extended to compensate for the loss of personal property." *Marshall v. Dep't of Water & Power*, 219 Cal. App. 3d 1124, 1138 (1990).

[13] A plaintiff is not required to bring a state court action where it would be futile under existing state law. Williamson, 473 U.S. at 196-96. An action will be considered futile only if the plaintiff can show that "the state courts establish that landowners may not obtain just compensation through an inverse condemnation action under any circumstances." Austin v. City and County of Honolulu, 840 F.2d 678, 681 (9th Cir. 1988). Plaintiff has not suggested that a state inverse condemnation claim would be futile in this case.

However, this invocation does not get Plaintiff very far, as the facts alleged in the FAC do not support a takings claim, at least not under federal takings jurisprudence.

The takings clause applies to two types of government action: (a) the taking of physical possession of property or of an interest in that property for a public use; and (b) the regulatory prohibition of a private use. *See Tahoe–Sierra Pres. Council, Inc., v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321-23 (2002). "The first type of taking occurs through the physical appropriation of property. The second type—regulatory taking—involves state imposition of a regulation that prohibits or prevents property owners from using their property in a way that diminishes its value." *Mateos-Sandoval v. County of Sonoma,* 2012 WL 6086225 (N.D. Cal. Dec. 6, 2012).

The reasoning of the recent district court decision in *Mateos-Sandoval* is highly instructive here. That case concerned California Vehicle Code § 14602.6(a)(1), which permits impoundment of a vehicle under certain circumstances, when a peace officer determines the driver was operating the vehicle without a valid license. 2012 WL 6086225, *1. Plaintiffs challenged the impoundment of their vehicles pursuant to § 14602.6(a)(1) on Fourth Amendment, Fourteenth Amendment procedural due process, and Fifth Amendment takings grounds. Examining the Fifth Amendment Claim, the district court addressed defendants' argument that plaintiffs are not entitled to just compensation for the takings of their vehicles because they were not taken for "public use." *Id*. at 16.

> The Supreme Court has construed the public use requirement broadly. *See Kelo v. City of New London*, 545 U.S. 469, 483 (2005) (noting that Court's "public use jurisprudence has ... eschewed rigid formulas and intensive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power"); *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240, (1984) (holding that the scope of the "public use" requirement of the Taking Clause is "coterminous with the scope of the sovereign's police powers").

> In *Bennis v. Michigan*, the Court considered whether the state's forfeiture of a woman's interest in a car constituted a "public use." The state trial court ordered the sale of the car pursuant to an indecency statute after her husband had sex with a prostitute in it while it was parked on a Detroit city street. 516 U.S. 442, 453 (1996). Having determined that the

sale did not violate the Fourteenth Amendment's due process clause, the Court further held:

> [I]f the forfeiture proceeding here in question did not violate the Fourteenth Amendment, the property in the automobile was transferred by virtue of that proceeding from petitioner to the State. <u>The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain.</u>

*Bennis*, 516 U.S. at 452. Similarly, in Tate v. District of Columbia, the D.C. Circuit held that the impoundment and sale of Plaintiff's vehicle as a result of unpaid traffic fines did not "constitute a taking for public use for which she was entitled to compensation under the Fifth Amendment's Takings Clause." 627 F.3d 904, 909 (D.C. Cir. 2010). The Court reasoned that "if the [government's] impoundment of Tate's vehicle did not deprive her of due process ... then there was no unlawful taking and no compensation due for the lawful taking that did occur." *Id*.

In the present case, if Plaintiffs can prove their Fourth Amendment claim, then Defendants' interference with their property rights—the impoundment of their trucks—was unjustified. But that does not mean that the taking was "for public use." The takings clause only "requires compensation in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005). The "public use" requirement "goes to the legitimacy of the government's taking to begin with; if a taking is not for public use, the government has no right to complete the act of eminent domain." Lee v. City of Chicago, 330 F.3d 456, 475 (7th Cir.2003) (Wood, J., concurring). The unlawful seizure of property therefore does not constitute "public use."

If, on the other hand, Plaintiffs ultimately fail to prove their Fourth Amendment claim, their takings clause claim would also fail because Defendants lawfully acquired their trucks "under the exercise of governmental authority other than the power of eminent domain." *Bennis*, 516 U.S. at 452. To be clear, as a general matter, the applicability of one constitutional amendment does not preclude a claim under another. *See Soldal*, 506 U.S. at 70. But under the facts as alleged in the present case, Plaintiffs' takings clause claim cannot proceed under any theory of liability. It will therefore be dismissed.

2012 WL 6086225, *1 (emphasis added).

This case presents a nearly exact parallel to *Mateos-Sandoval*. Plaintiff alleges his property was <u>unlawfully</u> destroyed by Defendants in violation of the Fourth and Fourteenth Amendments. If he prevails on any such claim, he will have demonstrated that the destruction was <u>unlawful</u>, and therefore could not possibly be a taking because the conduct was not a "proper interference" with his property rights. On the other hand, if he does not prevail on any Fourth or Fourteenth Amendment claim, then

23

Defendants <u>lawfully</u> destroyed his property "under the exercise of governmental authority <u>other than the</u>

<u>power of eminent domain</u>." In either event, takings liability has not been triggered.

The one decision that even arguably supports the existence of a takings claim here is not

persuasive. The district court in *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1570 (S.D. Fla. 1992),

reasoned, in a footnote, that the City of Miami's seizure and destruction of homeless individuals'

property constituted a taking of private property for public use without just compensation:

> The [] City's seizure and destruction of plaintiffs' personal property violate the fifth amendment, which prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V.
>
> The City argues that plaintiffs' fifth amendment claim must fail because they have not shown that their property was taken for a "public use." However, the United States Supreme Court has defined "public use" very broadly. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 240 (1984). In *Midkiff,* the Court stated that "[t]he "public use" requirement is ... coterminous with the scope of a sovereign's police powers," id., and that the proper test is whether "exercise of the eminent domain power is rationally related to a conceivable public purpose," *id*. at 241. In rejecting the argument that the government must use or possess the condemned property, the Court stated that "it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause." *Id*. at 244. Similarly, under the *Midkiff* analysis, the fact that the City does not actually use or possess the property taken from the homeless does not mean that there is no "public use," and therefore no taking under the fifth amendment.
>
> Although the evidence does substantiate plaintiffs' claim that there have been "takings" of class members' property, the more difficult question in this case is how plaintiffs may be "justly compensated." The Supreme Court has defined "just compensation" as placing the property owner in the same position monetarily as he would have been if his property had not been taken. *United States v. Reynolds*, 397 U.S. 14, 16 (1970). The court is unable to address this issue based on the evidence presented. Consequently, the issue of "just compensation" will have to be the subject of a separate evidentiary hearing.

*Pottinger* fails to discuss *Bennis*, the more recent, and far more factually analogous, Supreme Court

authority relied upon in *Mateos-Sandoval*.[14] For that reason, this Court will follow *Mateos-Sandoval*, not

---

[14] In the summary judgment decision in *Kincaid*, the district court discussed the possible application of the Fifth Amendment takings clause to the facts of that case. 2008 WL 2038390, *5-10. Even though a Fifth Amendment takings claim was not pled, the City argued the Fourteenth Amendment procedural due process claim should be subsumed in a Fifth Amendment claim and dismissed because plaintiffs failed to exhaust state remedies. After a lengthy discussion of possibly applicable Fifth Amendment takings jurisprudence, the district court rejected the City's argument that plaintiffs' Fourteenth Amendment claim should be replaced by a Fifth Amendment claim.

*Pottinger*, and finds that the FAC cannot possibly state a claim under federal takings jurisprudence. The parties have not briefed the issue of whether such a claim could nevertheless be stated under California inverse condemnation jurisprudence, but no authority the Court has been able to locate indicates California courts would diverge from federal jurisprudence substantially.

Accordingly, Defendants' motion to dismiss takings claim is GRANTED WITHOUT LEAVE TO AMEND, as amendment would be futile under federal precedent. If Plaintiff believes California caselaw demands a different conclusion, he may file a motion to amend the complaint setting forth relevant authorities.

### (5) Equal Protection Claim.

Plaintiff's Fourth Claim for Relief for "Denial of Constitutional Right to Equal Protection of the Laws – Fourteenth Amendment" alleges in pertinent part:

> Defendants' [] policies, practices and conduct are intended and designed to single out homeless people and have the purpose and effect of depriving homeless people of their property and of driving homeless people from the City of Fresno. These policies and actions are based on defendants' animus toward this disfavored group and lack a rational relationship to any legitimate government interest. In adopting and implementing these policies and practices with the intent to harm and disadvantage homeless persons in the City of Fresno, the defendants have violated the Equal Protection Clause of the United States Constitution and 42 U.S.C. § 1983

FAC ¶ 43.

There are several general methods by which a plaintiff may allege an equal protection violation. First, he may allege "defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Lee*, 250 F.3d at 686 (emphasis added). Such actions are subjected to "strict scrutiny" and "will only be sustained if they are suitably tailored to serve a compelling state interest." *City of Cleburne, Tex., v. Cleburn Living Center*, 473 U.S. 432, 439 (1985). Similar oversight is applied where state action "impinges on personal rights," otherwise framed as "fundamental rights," protected by the Constitution." *Id*.

25

Alternatively, when a policy distinguishes one group of persons from another, that distinction must be rationally related to a legitimate governmental purpose. *Id*. at 439. Relatedly, an equal protection claim can lie where plaintiff can establish that he is a "class of one" in that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

### (a)   Strict Scrutiny.

Plaintiff asserts that strict scrutiny applies here on two independent grounds: (1) he is a member of a protected class; and (2) Defendants violated his fundamental rights.

### (i)   Protected Class.

As a general matter, a classification is suspect (and therefore entitled to strict scrutiny) if it is directed to a discrete and insular minority group. *United States v. Carolene Prods.*, 304 U.S. 144, 152 n.4 (1938); *Abebe v. Mukasey*, 554 F.3d 1203, 1206 (9th Cir. 2009). Courts have found that race, alienage, national origin, and to a some degree, gender and illegitimacy, are suspect classes. *See Cleburne*, 473 U.S. at 440-41. However, no court has ever held the homeless to be a suspect class under this standard. The Supreme Court has declined to define suspect classifications based upon housing status, *Lindsey*, 405 U.S. 56, or wealth, *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988). Although the Ninth Circuit has not directly addressed the issue, both the Eleventh and Third Circuits have refused to define homeless persons as a suspect class. *See Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1269 n. 36 (3d Cir. 1992). Likewise, several district courts within the Ninth Circuit have followed this rule. *See Batiste v. Williams*, 2012 WL 221921, *2 (D. Nev. Jan. 25, 2012); *Garber v. Flores*, 2009 WL 1649727, *10 (C.D. Cal. June 10, 2009); *Davidson v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. 1996); *Joyce v. City and County of San Francisco*, 846 F. Supp. 843, 859 (N.D. Cal. 1994). Although one district court in the Southern District of Florida noted that an argument could be made that the homeless bear "traditional indicia of

suspectness," that court declined to rule on the issue. *Pottinger,* 810 F. Supp. at 1578. This Court will follow the overwhelming weight of authority indicating the homeless are not a suspect class.

Plaintiff's contention that this is an issue not amenable to resolution on the pleadings is without merit. Courts have routinely treated this as an issue of law for the Court to determine without reference to the specific circumstances of the case. *See Batiste*, 2012 WL 221921 (dismissing pursuant to Fed. R. Civ. P. 12(b)(6) during screening process equal protection claim based upon assertion that homeless belong to a protected class); *Garber*, 2009 WL 1649727 (dismissing similar equal protection claim on Rule 12(b)(6) motion to dismiss).

Defendant's motion to dismiss any equal protection claim based upon classification of the homeless as "suspect" is GRANTED WITHOUT LEAVE TO AMEND.

### (ii)       Fundamental Rights.

Plaintiff next argues that his equal protection claim nevertheless is entitled to the benefit of strict scrutiny because Defendants' conduct violates his fundamental right to travel and/or his fundamental right to life under the Fourteenth Amendment. A classification that impinges upon a fundamental right must be "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982)

### a.       Right to Travel.

Plaintiff first argues that the Defendant's conduct is subject to strict scrutiny because it impinges upon his right to travel. The right of travel is a basic constitutional right. *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254 (1974). People have a constitutional right to move from one place to another as they wish. *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999). Laws that prevent migration from one part of the country to another impinge upon this right. *See Shapiro v. Thompson*, 394 U.S. 618 (1969) (holding unconstitutional statutory provision requiring welfare assistance applicants to reside in state at least one year immediately preceding application for assistance) reversed on other grounds by *Edelman*

*v. Jordan*, 415 U.S. 651 (1974); *Edwards v. California*, 314 U.S. 160 (1941) (curtailing immigration of new residents). Likewise, residency requirements that deny a basic "necessity of life" may render a statute unconstitutional in light of the right to travel. *Memorial Hospital*, 415 U.S. 250 (denying medical services to new residents).

A state law implicates the constitutional right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification that serves to penalize the exercise of that right. *Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 903 (1986) (internal citations and quotations omitted). Most of the Supreme Court jurisprudence on the subject concerns the latter category, such as laws that, by classifying residents according to the time they established residence, resulted in the unequal distribution of rights and benefits among otherwise qualified bona fide residents. *Id*. However, a law having an incidental impact on travel of a law but having a purpose other than restriction of the right to travel, and which does not discriminate among classes of persons by penalizing the exercise by some of the right to travel, is constitutionally permissible. *Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1100 (1995).

Plaintiffs again cite *Pottinger*, which concerned an allegation that the City of Miami had a "custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in basic activities of daily life – including sleeping and eating – in public places where they are forced to live." 810 F. Supp. at 1554. It was alleged that the City of Miami "arrested thousands of homeless people for such life-sustaining conduct under various City of Miami ordinances and Florida Statutes. *Id*. In *Pottinger,* the district court concluded that the City's enforcement practices, which "prevent homeless individuals who have no place to go from sleeping, lying down, eating and performing other harmless life-sustaining activities" burdened their right to travel, because this denies a "necessity of life." *Id*. at 1580.

*Pottinger's* right to travel holding has been rejected by more than one district court in this circuit. In *Davidson*, for example, the district court acknowledged *Pottinger*, but rejected its result, reasoning that a Tucson ordinance designed to clear a long-standing encampment occupied by homeless individuals did not impede the right to travel because the residents of that encampment "do not seek to <u>travel</u> anywhere; they seek only to remain." 924 F. Supp. at 994. Likewise, *Joyce v. City and County of San Francisco*, 846 F. Supp. 843 (N.D. Cal. 1994), concluded that a San Francisco program to rigorously enforce state and municipal laws predominantly violated by the homeless did not violate the right to travel because the program did not facially discriminate between those who are, and those who might be, city residents. *Roulette v. City of Seattle*, 850 F. Supp. 1442, 1447-48 (W.D. Wash 1994), distinguished the "sweeping ordinances imposing criminal liability for sleeping, lying down, eating and performing other life-sustaining activities in public places" at issue in *Pottinger* from a Seattle ordinance prohibiting sitting or lying on public sidewalks in commercial areas during certain hours and another prohibiting aggressive begging, reasoning that there was no evidence that Seattle was motivated by a desire to expel homeless individuals from its commercial areas and that the ordinances did not impede migration from its commercial areas by making it impossible for individuals to carry out essential activities in those areas.

*Davidson, Joyce,* and *Roulette* referenced *Tobe*, 9 Cal. 4th 1069, a challenge to a Santa Ana ordinance prohibiting camping and storing personal property on public streets and in other public areas. The California Supreme Court reviewed in detail both federal and California caselaw regarding the right to travel. While accepting the lower court's conclusion that the ordinance "may have the effect of deterring travel by persons who are unable to afford or obtain other accommodations in the location to which they travel," because the ordinance was nondiscriminatory, treating residents and nonresidents alike, it was "not constitutionally invalid because it may have an incidental impact on the right of some persons to interstate or intrastate travel." *Id.* at 1101; *see also Nishi v. County of Marin*, 2012 WL

566408 (N.D. Cal. Feb. 21 2012) (following *Tobe* to uphold ordinance banning camping on public lands); *Anderson v. City of Portland*, 2009 WL 2386056 (D. Oregon Jul. 31, 2009) (while acknowledging that "enforcement of [] anti-camping and temporary structure ordinances may render Portland unattractive to homeless persons, [] it does not constitute inference with plaintiffs' right to travel or freedom of movement that rises to the level of a constitutional deprivation").

Assuming the truth of the facts alleged in the FAC, Defendants have implemented a policy and/or practice of destroying the valuable property of homeless individuals when that property is left unattended. Invoking Pottinger, Plaintiff alleges that "forcing homeless individuals from sheltered areas or from public parks or streets affects a number of 'necessities of life' – for example, it deprives them of a place to sleep, of minimal safety and of cover from the elements." *Id*. But, the bulk of authority has rejected or declined to follow *Pottinger* in cases concerning policies designed to prevent homeless individuals from erecting shelters and/or leaving their belongings in particular places. Even if *Pottinger* is good law, the facts of that case are distinguishable. *Pottinger* involved a systematic program to arrest any homeless individuals found sleeping or performing essential functions in public places. In contrast, the facts of this case are far closer to those at issue in *Davidso*n, *Tobe*, and *Nishi*, and *Anderson*. To find that the present facts implicate the right to travel would simply stretch that jurisprudence too far.

Defendants' motion to dismiss any equal protection claim based upon the right to travel is GRANTED WITHOUT LEAVE TO AMEND.

**b.**   **Right to Life/Bodily Integrity.**

As discussed above, the FAC states a valid substantive due process claim based upon the "danger creation" doctrine, which concerns the fundamental right to life/bodily integrity. It is alleged that Defendants timed the demolitions of "plaintiff's shelter and property essential to protection from the elements" to occur at "the onset of the winter months that would bring cold and freezing temperatures, rain, and other difficult physical conditions." FAC ¶¶ 22, 24. It is further alleged that "Defendants

30

kn[ew] or should reasonably [have known] that their conduct threatened plaintiff's continued survival, but nonetheless continued their conduct in a manner that has created substantial risk to his ability to continue to survive and is shocking the conscience...." FAC ¶ 22. The FAC contains enough facts to support plausibly a substantive due process claim based upon the "danger creation" doctrine.

As this claim has survived dismissal, it may form the basis for a "fundamental rights" equal protection claim. In other words, if Plaintiff's allegations are proven, the policy may only be justified for equal protection purposes if it is "precisely tailored to serve a compelling governmental interest." No such compelling interest has been offered by any party. Accordingly, Defendants' motion to dismiss any equal protection claim based upon this fundamental right is DENIED.

### (b) **Rational Basis.**

#### (i) **Group Classification Rational Basis Test.**

In addition, Plaintiff alleges that Defendants instituted a policy that discriminated against the homeless as a group without any legitimate rational basis. Under the rational basis standard, a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne v. Cleburne Living Center,* 473 U.S. at 446.[15] Although *City of Cleburne* involved a challenge to legislation, the rational basis test is equally applicable to an unwritten policy or practice. For example, in *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580 (9th Cir.

---

[15] Defendant misstates the applicable standard, citing *Moua v. City of Chico*, 324 F. Supp. 2d 1132, 1137 (E.D. Cal. 2004), for the proposition that a section 1983 plaintiff alleging that a municipality's actions fail to satisfy the rational basis equal protection test must always prove: (1) defendants treated plaintiff differently from others similarly situated; (2) the unequal treatment was based on an impermissible classification; (3) defendants acted with discriminatory intent in applying this classification; and (4) plaintiff suffered injury as a result of the discriminatory classification. In fact, this test is used to determine whether a plaintiff has alleged an equal protection claim based upon heightened (intermediate or strict) scrutiny. The plaintiffs in *Moua* alleged that the City of Chico violated equal protection by failing to provide Hmong interpretation services during police investigations. *Id.* The district court examined whether the municipal policy/practice of failing to provide interpretation services to Hmong-speaking residents amounted to unequal treatment based upon an impermissible classification, which would have triggered a heightened level of scrutiny. Plaintiff's argument that language operated as a proxy for an ethnic classification, to which intermediate scrutiny indisputably applies, was rejected, in part because the facts did not involve the singling out or compulsion of persons speaking a particular language. *Id.* at 1138. Finding that the unequal treatment did not involve an "impermissible classification," and therefore that the four-part test articulated above was not satisfied, the district court nevertheless applied the "rational basis" test, inquiring whether the practice was "rationally related to a legitimate governmental purpose." *Id.* at 11

2008), the Ninth Circuit applied a rational basis analysis to an applicant's challenge to an Idaho land management agency's unwritten practice of requiring more specific grazing management plans from permit applicants associated with conservation interests than from applicants without such associations. Generally, "a state actor's classification comports with the Equal Protection Clause so long as it is 'rationally related to a legitimate state interest.'" *Id.* at 589 (quoting *Pennell v. City of San Jose,* 485 U.S. 1, 14 (1988)); *O'Haire v. Napa State Hosp.*, 2009 WL 2447752 (N.D. Cal. Aug. 7, 2009) (challenge to unwritten policy intentionally discriminating against homosexuals without rational basis stated valid equal protection claim).

Where a policy draws a distinction between groups of persons, that distinction must be rationally related to a legitimate government interest. *See Lazy Y Ranch*, 546 F.3d at 589 (no rational basis for distinguishing between bidders who were conservationists and those who were not). Here, the distinction itself is not disputed. It is generally alleged that the City's unwritten policy, custom, and practice targets the possessions of homeless individuals for cleanup, as the cleanups are directed at homeless encampments. *See generally* FAC.[16] This, therefore, creates a classification subject to equal protection analysis between: (a) the homeless, at whom the cleanups are directed, and (b) all other residents. The relevant inquiry is whether there is a rational basis for this classification.

There are many iterations of the rational basis test, but the most relevant appears to come from the Supreme Court's decision in *Romer v. Evans*:

> The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons. We have attempted to reconcile the principle with the reality by stating that, if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.

*Romer v. Evans*, 517 U.S. 620, 631 (1996). Because *Romer* concerned a law targeted at homosexuals, a

---

[16] Plaintiff does not allege that the property of the homeless was treated differently from similarly situated property belonging to non-homeless persons, which seems to have formed the basis of the *Kincaid* court's equal protection analysis.

"politically unpopular" group, its approach to the equal protection analysis is most relevant here. *See Roulette*, 97 F.3d at 316 (applying *Romer's* "politically unpopular" equal protection reasoning to homeless individuals); *Chosen 300 Ministries, Inc. v. City of Philadelphia*, 2012 WL 3235317, *23 (E.D. Pa. Aug. 9, 2012) (same).

The *Romer* Court began its analysis by searching for the "relation between the classification adopted and the object to be obtained." *Romer*, 517 U.S. at 632.

> The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority. In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.

*Id*. The Colorado Constitutional Amendment at issue in *Romer* was found to lack any rational basis for two central reasons. First, the Amendment was found to be "at once too narrow and too broad," because "[i]t identifies persons by a single trait and then denies them protection across the board." *Id*. at 633. "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Id*. Second, such a law was found to "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id*. at 634. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id*.

> Even laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it.

*Id*. at 635.

The present claim presents no parallel to *Romer*. The City's cleanups are targeted at conduct and

do not make it more difficult for homeless individuals to seek aid from the government. Moreover, the cleanups can be justified for numerous reasons, including aesthetics, sanitation, public health and safety. *Davison v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. 1996) ("Given the City's concerns about crime, sanitation, aesthetics, and homeless individuals' use of fire, the Court would be hard-pressed to decide that the Defendants' [termination of a homeless encampment] could not withstand this relatively relaxed constitutional scrutiny.").

Plaintiff attempts to take the equal protection analysis a step farther by asking whether there is a rational basis for the exact manner in which the cleanups were implemented, namely, without notice and in a manner that resulted in the summary destruction of important personal property and which exposed homeless individuals to inclement weather. This mixes Plaintiff's other constitutional claims with his equal protection claim. The unwritten policy allegedly implemented by the City was simply to clean up the encampments. The fact that these clean ups were undertaken allegedly without proper procedure and in possible violation of various constitutional rights is a matter for separate evaluation.

Defendant's motion to dismiss any equal protection claim based on the argument that there was no rational basis for Defendant's conduct is GRANTED WITHOUT LEAVE TO AMEND.

### (ii)    Olech "Class of One" Not Alleged.

An equal protection claim can lie where plaintiff can establish that he is a "class of one" in that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Plaintiff concedes that he does not claim he is a "class of one" for purposes of equal protection. Doc. 40 at 21.

### b.    Individual Defendants' Motion to Dismiss Federal Claims.

### (1)    Joinder in City's Motion Re: Constitutional Claims.

The Individual Defendants incorporate the City's legal arguments as to Sanchez's Constitutional Claims. Doc. 38-9 at 7. Accordingly, the above rulings bind the Individual Defendants.

34

**(2)** **Official Capacity Claims Against Individual Defendants**

The Individual Defendants separately move to dismiss any official capacity claims against them, arguing that any such allegations are redundant. The law on this issue is well-established. "Claims against government officials in their official capacities are really suits against the governmental employer because the employer must pay any damages awarded." *Butler v. Elle*, 281 F.3d 1014, 1023 (9th Cir. 2002) (internal citations omitted). Official capacity suits generally represent only another way of pleading an action against the entity that employs the agent. *Wolfe v. Strankman*, 392 F.3d 358, 364-65 (9th Cir. 2004) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). An official capacity suit is treated as a suit against the government entity "as long as the [entity] receives notice and an opportunity to respond." *Ruvalcaba v. City of L.A.*, 167 F.3d 514, 524 n. 3 (9th Cir. 1999) (quoting *Ky. v. Graham*, *473 U.S. 159*, 166 (1985)). Where both the public entity and a municipal officer are named in a lawsuit, a court may dismiss the individual named in his official capacity as a redundant defendant. *Hernandez v. City of Napa*, 781 F. Supp. 2d 975, 1001 (N.D. Cal. 2011).[17] Accordingly, the Individual Defendants' motion to dismiss the official capacity claims against them is GRANTED, as all Individual Defendants are employees of a named municipal Defendant.

However, this does not entitle the Individual Defendants to dismissal from the lawsuit, as all are alleged to have acted in their individual capacities. This is a matter to be taken up in a timely Rule 56 motion.

//

//

//

---

[17] Plaintiff's contention that this rule does not apply when injunctive relief is requested is without merit. The presence of injunctive relief may warrant the retention of official capacity individual defendants under the *Ex Parte Young* doctrine where the Eleventh Amendment protects a state, instrumentalities of a state, or even municipalities acting "in a single consolidated effort" with the state. *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 957 (9th Cir. 2002). Here, however, the full Eleventh Amendment immunity afforded states and their instrumentalities does not apply, "for under *Monell* [] local government units can be sued directly for damages and injunctive or declaratory relief." *Kenducky v. Graham*, 473 U.S. 159, 167 (1985).

4.     **California Claims.**

   a.     **Supplemental Jurisdiction.**

A federal court may exercise supplemental jurisdiction where state law claims are so related to claims over which the court has federal question jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a). Nevertheless, a district court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Parties appear to be operating under the assumption it is appropriate for the Court to exercise supplemental jurisdiction over the state law claims in this case. The Court is of a similar opinion. The state law claims are closely related to the federal claims, sometimes overlapping almost entirely, do not predominate over the federal claims, do not raise novel or complex issues of state law, and no exceptional circumstances are apparent.

   b.     **California Constitutional Claims.**[18]

   (1)     **California Constitutional Damages.**

It is undisputed that the California Constitution does not provide a direct cause of action for damages for either equal protection or a due process liberty interest violation. *Katzberg v. Regents of the Univ. of Cal.*, 29 Cal. 4th 300, 321 (2002) (due process); *Richards v. Dep't of Alcoholic Beverage Control*, 139 Cal. App. 4th 304, 317 (2006) (due process); *Javor v. Taggart*, 98 Cal. App. 4th 795, 807

---

[18] These arguments are set forth in the City's motion, but the Individual Defendants incorporate the City's legal arguments as to Sanchez's California Constitutional Claims. Doc. 38-9 at 7. Accordingly, the ruling described below binds the Individual Defendants as well as the City.

(2002) (no damages cause of action for violation of California Constitution's due process or equal

protection provisions). Likewise, California law does not provide for a direct cause of action for

damages for violation of the California Constitutional protection against unreasonable searches and

seizures. *Brown v. County of Kern*, 2008 WL 544565, *17 (E.D. Cal. Feb. 26, 2008). Plaintiff does not

dispute this. Doc, 40 at 25-26. To the extent Plaintiff seeks monetary damages directly under any of

these provisions of the California Constitution, such relief is unavailable.

However, the claims themselves survive, because Plaintiff has also requested declaratory and

injunctive relief. FAC, Prayer, at ¶ 1. Injunctive relief is an available remedy. *Katzberg*, 29 Cal. 4th at

307. Defendants' suggestion that injunctive relief is unavailable because any such request is "moot as

Sanchez already has adequate protection through the Kincaid settlement and Court order, wherein the

Court retained jurisdiction to address any issues that arose with respect to the City Defendant's failure to

adhere to the settlement and Administrative Order No. 6-23," Doc. 43 at 13, is without merit. Nothing in

the *Kincaid* settlement precluded separate litigation based upon subsequent, post-settlement conduct.

Defendants' related assertion that a request for declaratory relief is inappropriate because "the

request improperly invades the province of the jury" is likewise unsupportable. There is ample support

for the maintenance of a claim for declaratory relief from a California Constitutional violation.

Declaratory relief is available under California law, *Baxter Healthcare Corp. v. Denton,* 120 Cal. App.

4th 333, 360 (2004) ("declaratory relief operates prospectively, and not merely for the redress of past

wrongs. It serves to set controversies at rest before they lead to repudiation of obligations, invasion of

rights or commission of wrongs; in short, the remedy is to be used in the interests of preventive justice,

to declare rights rather than execute them"), and Defendants have cited no authority suggesting such

relief is unavailable in the specific context of a California Constitutional equal protection or due process

claim, nor, for that matter, have they cited any authority suggesting declaratory relief is unavailable in

the context of claims that are usually decided by a jury.

In addition, Plaintiff seeks the return of his property, a form of relief that appears to be available in the context of an alleged due process property interest violation. *See Walls v. Central Contra Costa Transit Auth.*, 2012 WL 581362, *3-4 (N.D. Cal. Feb. 22, 2012) (backpay available as remedy for failure to provide pre-termination hearing).

Defendants' motion to dismiss any damages claim based upon the California Constitution is GRANTED; as to all other requested forms of relief, the motion is DENIED.

### (2)      Equal Protection Claims.

The City argues that Plaintiff cannot maintain his equal protection claim under the California Constitution because the standards for establishing a "class of one" claim under the California Constitution are the same as those applicable to an equal protection claim brought under United States Constitution. As discussed above, Plaintiff concedes that he is not bringing a class of one claim. However, he has successfully pled an equal protection claim based upon the alleged violation of his fundamental right to life/bodily integrity under the "danger creation" doctrine. Just like the U.S. Constitution, the California Constitution protects persons from deprivation of "life, liberty, or property without due process of law." Cal. Const. art. I, § 7(a). California's Due Process Clause is "identical in scope with the federal due process clause." *Owens v. City of Signal Hill*, 154 Cal. App. 3d 123, 201 n.2 (1984); *Botello v. Morgan Hill Unified Sch. Dist.*, 2009 WL 3918930 (N.D. Cal. Nov. 18, 2009) (treating California Constitution's due process clause as identical to federal Constitutional due process protection for purposes of evaluating a "danger creation" cause of action). Likewise, California Constitutional provisions granting equal protection have been found "'substantially the equivalent' of the equal protection clause of the Fourteenth Amendment to the federal constitution. *Serrano v. Priest*, 18 Cal. 3d 728, 763 (1976) supplemented, 20 Cal. 3d 25 (1977); *Walgreen Co. v. City & County of San Francisco*, 185 Cal. App. 4th 424, 434 n.7 (2010)

Defendants' motion to dismiss any equal protection claim brought under the California

38

Constitution based upon impingement of the fundamental right to life/bodily integrity is DENIED; as to all other forms of equal protection, the motion is GRANTED.

### c.   Bane Act Claim.

Plaintiff's ninth claim for relief arises under California Civil Code Section 52.1, the so-called "Bane Act," which permits a private right of action for damages:

> If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state...

Cal. Civ. Code § 52.1(a).

### (1)   City's Motion to Dismiss.

The City argues that because this provision is directed at "a person or persons" a Bane Act claim cannot lie against a municipality. The City cites several cases that provide some general support for this interpretation. For example, *Community Memorial Hospital v. County of Ventura*, 50 Cal. App. 4th, 199, 209 (1996), discusses California Business and Professions Code § 17201, which applies only to "persons," and which defines "persons" to "include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Because a county does not fall within the scope of any of those terms as a county is defined under state law, this is a "strong indication" that the California Legislature did not intend for counties to be covered by § 17201. *Id.*

No California court has directly interpreted the Bane Act's "person or persons" language. However, several federal courts interpreting the statute have concluded municipalities <u>do</u> fall within its purview. *Dorger v. City of Napa,* 2012 WL 3791447, at *7 (N.D. Cal. Aug. 31, 2012) ("The City offers no authority for the notion that it cannot be considered a 'person' . . . to the contrary, the authorities interpreting the statute show that a public entity can be liable for 'misconduct that interferes with federal or state laws, if accompanied by threats, intimidation, or coercion, and whether or not state action is

involved'"); *Cameron v. Buether*, 2010 WL 1202318, at *5 (S.D. Cal. March 23, 2010) (rejecting City of San Diego's argument that the statute did not apply to government entities); *Shoval v. Sobzak*, 2009 WL 2780155 *3 (S.D. Cal. Aug. 31, 2009) ("Defendants have not made a sufficient showing that this definition does not encompass California counties, especially in light of the many cases naming counties as defendants in § 52.1 causes of action."). The Court is not persuaded by the City's contention that these cases should be disregarded because those courts did not consider the cases and textual arguments presented herein. The cases cited by Defendants here all concern California Business and Professions Code § 17201, which specifically defines "persons" in a manner that permits the exclusion of governmental entities. The Bane Act contains no such definition. The only relevant authorities (i.e., the unpublished federal decisions cited above) are far more persuasive.

The City's motion to dismiss the Bane Act claim on the ground that the Bane Act cannot be applied to a municipality is DENIED.

### (2)   Individual Defendants' Motion to Dismiss.

The Bane Act prohibits "persons" from interfering "by <u>threats, intimidation, or coercion</u> ... with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]...." Cal. Civ. Code § 52.1 (emphasis added). Whether there was a violation of a right and whether that violation was accomplished by threat, intimidation or coercion are separate analytical inquiries. *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1064 (E.D. Cal. 2009). Although a complaint need not use the statutory terms "threats, intimidation, or coercion," it must allege facts from which the presence of threats, intimidation, or coercion may be inferred. *See Lopez v. County of Tulare*, 2012 WL 33244, *11 (E.D. Cal. Jan. 6, 2012).

Plaintiff has alleged a large-scale operation in which City of Fresno employees destroyed large numbers of shelters and discarded more than 200 tons of material belonging to homeless persons using

40

heavy equipment. FAC ¶ 21. The FAC essentially alleges two types of threatening conduct. First, Plaintiff suggests that the demolition itself was conducted in a threatening manner because of the number of individuals involved and the use of heavy equipment. "The text of the Bane Act ... indicates that a cause of action under the act requires a predicate—the application of threat, intimidation or coercion—and an object—interference with a constitutional or statutory right." *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D. Cal. 2011). For example, if the object is interference with the right to be free from the use of force or the threat of force, a violation of that right cannot also satisfy the predicate requirement of the application of threat, intimidation or coercion. *Id*. Here, the FAC suggests the cleanups may have been pursued in a manner that was inherently intimidating (i.e. above and beyond that which was necessary to effectuate the cleanup). Although such allegations might, in a general sense, be sufficient to survive a motion to dismiss, the FAC fails to connect each Individual Defendant to the intimidating nature of the cleanups. For this reason, the Individual Defendants' motion to dismiss any Bane Act claim of this nature is GRANTED WITH LEAVE TO AMEND. If amended, amend with provable facts.

In addition, the FAC alleges that Plaintiff was informed and believed that Fresno Police Department officers threatened some individuals who sought to retrieve their property with arrest. *Id*. The Individual Defendants argue that the "information and belief" of a threat of arrest is insufficient. Doc. 38-9 at 10. However, the FAC also alleges that the knowledge of these threats intimidated Plaintiff and "made him fearful for his safety and of arrest or retaliation should he attempt to recover his property." *Id*. The relevant inquiry under the Bane Act "is whether a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendants and have perceived a threat of violence." *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1147 (N.D. Cal. 2010). The FAC contains sufficient factual allegations to suggest a reasonable person would have been intimidated by the FPD Officers' conduct. The problem is: the FAC does not name any individual FPD Officers as

41

1    Defendants and fails to connect any of the named Individual Defendants to the alleged arrest threats.[19]

2    The moving Individual Defendants' motion to dismiss any Bane Act claim based upon threat of arrest is

3    GRANTED WITH LEAVE TO AMEND.

4

5         **d.    Tort Claims.**

6         Plaintiff's tenth (intentional infliction of emotional distress) and eleventh (common law

7    conversion) claims are California tort claims presumably leveled against all defendants, as no specific

8    defendants are excluded. FAC at 25-26.

9

10        **(1)    City's Motion to Dismiss.**

11        The City moves to dismiss these claims on the ground that California's Tort Claims Act

12   ("CTCA"), Cal. Gov. Code § 815 *et seq.,* "abolished all common law or judicially declared forms of

13   liability for public entities, except for such liability as may be required by the federal or state

14   constitution." *Cochran v. Herzog Engraving Co.*, 155 Cal. App. 3d 405, 409 (1984).

15        For the first time in his opposition, Plaintiff alleges that the City is vicariously liable under the

16   CTCA. To state a tort claim against a public entity, a plaintiff must allege compliance with the claims

17   presentation requirements of the CTCA. *Brooks v. United States*, 2008 WL 115203 (E.D. Cal. Jan. 10,

18   2008) (citing *State v. Superior Court of Kings County (Bodde)*, 32 Cal.4th 1234, 1245 (2004)). The

19   CTCA is nowhere referenced in the FAC, nor has Plaintiff alleged compliance with its exhaustion

20   requirements. The FAC fails to allege sufficiently a CTCA claim. The City's motion to dismiss the tort

21   claims against it is GRANTED WITH LEAVE TO AMEND.

22

23

24

---

25   [19] Plaintiffs suggest the Individual Defendants may nevertheless be liable under the Bane Act because they supervised individuals who were responsible for any threats, intimidation or coercion. But, Plaintiffs cite no cases that persuasively

26   support imposition of supervisor liability under the Bane Act. Although Plaintiff is correct that a supervisor maybe liable under 42 U.S.C. § 1983 where there is "a sufficient causal connection between the supervisor's wrongful conduct and the

27   constitutional violation...." *Starr v. Baca*, 652 F. 3d 1202, 1207 (9th Cir. 2011), and the Bane Act has been referenced as the "state equivalent" to § 1983, *Sacco v. Benzinger*, 2003 WL 24108414, *1 (N.D. Cal. Dec. 18, 2003), no case has actually

28   applied supervisor liability to a Bane Act claim and this federal Court is loathe to expand the reach of Bane Act liability.

**(2)** **Individual Defendants' Motion.**

**(a)** **Conversion Claim.**

The Individual Defendants argue that Plaintiff cannot maintain a conversion claim against them because he has not set forth allegations supporting each element of a conversion claim against each Individual Defendant. "The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort." *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1065 (1998). The Individual Defendants' motion is vague, but it appears they are arguing that Plaintiff has not sufficiently alleged that each Defendant's conduct was a substantial factor in causing Plaintiff's harm, one of the elements set forth in California's Civil Jury Instruction pertaining to conversion. CACI No. 2101. Assuming, *arguendo*, that an element set forth in a jury instruction should be applied as a pleading requirement, the FAC contains sufficient allegations. The FAC details each Individual Defendant's role in designing and implementing the unwritten policy and practice that underpinned the cleanups at issue in this case. For example, it is alleged that Defendant Swearengin personally authorized and directed the demolition of Plaintiff's shelter and the destruction of his personal property. FAC ¶ 9. The FAC contains similar allegations of personal involvement as to each Individual Defendant. This is more than sufficient for pleading purposes.

The Individual Defendants' motion to dismiss the conversion claim is DENIED.

**(b)** **Statutory Immunities.**

The Individual Defendants also argue that a number of statutory immunities protect them against both tort claims.[20] For example, Individual Defendants reference California Government Code § 820.2, which provides:

---

[20] Although the relevant caption in Individual Defendants' motion references only the Conversion claim, this argument appears to be directed at both tort claims. *See* Doc. 38-9 at 12 (many of the claims are barred by California statutory immunities").

43

1
2
> A public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

3   Likewise, California Government Code § 820.4 provides:

4
5
> A public employee is not liable for his act or omission, exercising due care in the execution or enforcement of any law....

6   As to these and several other referenced provisions of the California Government Code, Plaintiff

7   responds that the application of these statutory immunities involves fact-intensive inquiries not

8   amenable for resolution on a motion to dismiss. Doc. 40 at 31. With one exception, Individual

9   Defendants do not address this issue in their reply. Accordingly, it appears they have conceded the point

10  as to most of the asserted statutory immunities.

11
12  As to California Government Code § 820.7, which provides "a public employee is not liable for

injury caused by the act or omission of another person," the FAC does not suggest such liability.

13
14  Individual Defendants will be held accountable in tort only for their own conduct.

15      To the extent the FAC asserts Individual Defendants should be liable for the conduct of others,

16  Individual Defendants' motion to dismiss the tort claims pursuant to Cal. Gov. Code § 820.7 is

17  GRANTED; as to all other asserted statutory immunities the motion is DENIED.

18
19          e.    **Contract Claim.**

20      Plaintiff's twelfth claim for relief is for breach of contract and alleges that the City's execution of

21  the Settlement Agreement constitutes a contractual promise to refrain from destroying their property

22  without notice and/or reasonable opportunity to recover that property. FAC ¶ 69. Plaintiff alleges that he

23  has complied with the terms of the *Kincaid* Settlement Agreement, FAC ¶ 71, and that the City and

24  Defendants Weathers, Dyer and Caltrans[21] have breached their obligations under the agreement, FAC ¶

25  72.

26
27
28

---

[21] CalTrans, an arm of the State of California, is not named directly as a defendant. Rather, Malcolm Dougherty, the current Director of CalTrans, is named. Neither he nor Caltrans has filed a motion to dismiss.

Defendants Swearengin, Scott, Rudd and Barfield, move to dismiss the contract claim against them on the ground that they were not signatories to the agreement. Doc. 38-9 at 7. Plaintiff concedes that these movants are not signatories to the settlement, but asserts they are nevertheless bound by its terms. Doc. 40 at 26. Paragraph 3.1.2 of the Settlement Agreement binds "all agents and employees of the City of Fresno" to comply with AO 6-23 for a period of five years from the date the settlement was approved (July 25, 2008).

In reply, Defendant's cite California Civil Code § 1559, which provides that "[a] contract, made expressly for the benefit of a third person, may be enforced by him...," but entirely fail to explain how this provision precludes the contract claims against movants.

There is a line of California authority holding non-signatories may be bound by the terms of an agreement if they are agents of a signatory. *See, e.g., Rowe v. Exline*, 153 Cal. App. 4th 1276, 1284 (2007). Although *Rowe* and numerous other cases containing similar reasoning concern the enforcement of arbitration agreements, the Court does not see any reason why the rule should be limited to arbitration agreements. All of the moving Individual Defendants are indisputably agents of the City, which is a signatory to the Settlement Agreement.

Defendants Swearengin, Scott, Rudd and Barfield's motion to dismiss the contract claim on the ground that they are not signatories to the Settlement Agreement is DENIED.

### f.   Cal. Civ. Code § 2080.

The eighth claim for relief alleges Defendants' conduct violated California Civil Code § 2080, which provides:

> Any person who finds a thing lost is not bound to take charge of it, unless the person is otherwise required to do so by contract or law, but when the person does take charge of it he or she is thenceforward a depositary for the owner, with the rights and obligations of a depositary for hire. Any person or any public or private entity that finds and takes possession of any money, goods, things in action, or other personal property, or saves any domestic animal from harm, neglect, drowning, or starvation, shall, within a reasonable time, inform the owner, if known, and make restitution without compensation, except a reasonable charge for saving and taking care of the property. Any person who takes

45

possession of a live domestic animal shall provide for humane treatment of the animal. The Individual Defendants move to dismiss this claim on the ground that Plaintiff has not alleged that his property was "lost" or that any of the Individual Defendants took possession of any lost property. Doc. 38-9 at 11. Plaintiff maintains that Individual Defendants read the statute too narrowly and that § 2080 imposes duties on persons and government entitles whenever they take control of another person's property.

In keeping with a developing pattern, the parties cite no authority to support their respective interpretations. A preliminary inquiry reveals that at least one case has applied § 2080 to property belonging to but temporarily unattended by homeless individuals. *See Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1016 (C.D. Cal. 2011) (finding Los Angeles ordinance permitting seizure and destruction of property found on Skid Row during certain hours to be in conflict with § 2080). The *Kincaid* court raised some questions about the applicability of the statute to homeless individuals' property seized by the City, but did not reject such an interpretation outright. *Kincaid v. City of Fresno*, 2008 WL 2038390, *13 (E.D. Cal. May 12, 2008).

More critical to this motion is the lack of <u>any</u> authority suggesting the Individual Defendants, none of whom actually collected any of the property in question, can nevertheless be liable under § 2080. For this reason, Individual Defendant's motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND.

**B.     Motion for A More Definite Statement**

Both the City and the Individual Defendants move in the alternative for a more definite statement pursuant to Fed. R. Civ. P. 12(e). Prior to filing a responsive pleading, a party may move under Federal Rule of Civil Procedure 12(e) for a more definite statement of a pleading if it "is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). The purpose of Rule 12(e) is to provide relief from a pleading that is unintelligible, not one that is merely lacking detail. *Neveu v. City*

46

*of Fresno*, 392 F. Supp. 2d 1159, 1169 (E.D. Cal. 2005). Where the complaint is specific enough to apprise the responding party of the substance of the claim being asserted or where the detail sought is otherwise obtainable through discovery, a motion for a more definite statement should be denied. *See Famolare, Inc. v. Edison Bros. Stores, Inc.,* 525 F. Supp. 940, 949 (E.D. Cal. 1981) ("Due to the liberal pleading standards in the federal courts embodied in Federal Rule of Civil Procedure 8(e) and the availability of extensive discovery, the availability of a motion for a more definite statement has been substantially restricted."). Thus, motions pursuant to Rule 12(e) are generally "viewed with disfavor and are rarely granted[.]" *Sagan v. Apple Computer, Inc*., 874 F. Supp. 1072, 1077 (C.D. Cal. 1994).

Here, neither motion offers any specific arguments in support of requiring a more definite statement. Doc. 38-1 at 24; Doc. 38-9 at 13. In the absence of any specific arguments offered by movants, the Court finds that the FAC is specific enough to apprise Defendants of the substance of the claims being asserted, particularly in light of the fact that additional detail sought is obtainable through discovery. The motions for more definite statement are DENIED.

**C.**    **Motion to Strike.**

    **1.**    **Standard of Decision.**

Federal Rule of Civil Procedure 12(f) permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Redundant allegations are those that are needlessly repetitive or wholly foreign to the issues involved in the action." *California Dept. of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002) (internal quotation marks and citations omitted). Immaterial matter is "that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) (internal quotation marks and citations omitted), rev'd on other grounds, 510 U.S. 517 (1994). Impertinent matter "consists of statements that do not pertain, and are not necessary, to the issues in question." *Id*. Scandalous matter is that which

"improperly casts a derogatory light on someone, most typically on a party to the action." *Germaine Music v. Universal Songs of Polygram*, 275 F. Supp. 2d 1288, 1300 (D. Nev. 2003) (internal quotation marks and citations omitted).

The function of a Fed. R. Civ. P. 12(f) motion is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). "Motions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic." *Alco Pacific*, 217 F. Supp. 2d at 1033; *see also Neveu*, 392 F. Supp. 2d at 1170 (Motions to strike are generally disfavored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation."). "Given their disfavored status, courts often require a showing of prejudice by the moving party before granting the requested relief." *Alco Pacific*, 217 F. Supp. 2d at 1033 (internal quotation marks and citations omitted). "The possibility that issues will be unnecessarily complicated or that superfluous pleadings will cause the trier of fact to draw 'unwarranted' inferences at trial is the type of prejudice that is sufficient to support the granting of a motion to strike." *Id.* (citing *Fogerty*, 984 F.2d at 1528).

### 2.   Damage Claim for State Constitutional Violations.

City Defendants, joined by the Individual Defendants, argue that because Plaintiff is not entitled to assert a claim for damages under any of his theories for violation of the California Constitution, those damages claims should be stricken. As has been acknowledged above, Defendants are correct that damages are not available for these claims. However, Plaintiff's damages prayer is not specifically directed toward his California Constitutional claims. The damages prayer has a possible bearing on other claims in the case. Defendants' motion to strike the damages claim for the California Constitutional Violations is DENIED.

48

### 3.    Punitive Damages.

Likewise, Defendants move to strike the punitive damages allegations in the FAC on the ground that punitive damages are not available against the City. *See* Cal. Gov. Code § 818; *City of Newport v. Fact Concert*s, 453 U.S. 247, 259-60 (1981); *Ferguson v. City of Phoenix*, 157 F. 3d 668, 671 (9th Cir. 1998). However, as is the case with the general damages allegation, the punitive damages allegation is not directed at the City. It has a possible bearing on the subject matter of the litigation. Defendants' motion to strike the punitive damages allegation is DENIED

### a.    Injunctive Relief.

The Individual Defendants, joined by the City, argue that the injunctive relief prayer should be stricken. Doc. 38-9 at 15; Doc. 38-1 at 25. They base this argument on the assertion that "nothing in the complaint suggests real and immediate threat of injury," in part because Plaintiff "already has adequate protection through the prior settlement and court order." Doc. 38-9 at 15. Plaintiff has alleged that Defendants engaged the widespread practice of unlawfully destroying their shelters and personal belongings, the exact same conduct that was alleged in the *Kincaid* case, and that Defendants "intend to continue this unlawful conduct." FAC ¶ 28. This is sufficient to satisfy the requirement that a prayer for injunctive relief have some possible bearing on the subject matter of the litigation. The motion to strike the prayer for injunctive relief is DENIED.

### b.    Judicial Declaration.

The Individual Defendants, joined by the City, argue that the prayer for a judicial declaration should be stricken for several reasons. Doc. 38-9 at 16; Doc. 38-1 at 25. First, Defendants argue that the prayer is not tied to a specific cause of action. This is a common pleading technique and does not justify striking the allegation.

Second, Defendants argue that the request "improperly invades the province of the jury, as it is the jury that will determine if a constitutional violation occurred." An essentially similar argument made

49

in the motions to dismiss was rejected above and is no more valid here.

Finally, Defendants argue that no judicial declaration is necessary, as the *Kincaid* Settlement and AO 6-23 already define the obligations of the parties. This is, quite simply, difficult to understand. The *Kincaid* Settlement may establish some contractual rights, but does not define the parties' rights vis-à-vis the violations alleged in the FAC.

Defendants' motion to strike the request for a judicial declaration is DENIED.

### 4.      California Statutory Penalties.

The Prayer also requests statutory penalties under California Civil Code §§ 52 and 52.1 as well as Government Code § 815.6. FAC at 27.

The City argues that the prayer for damages under § 52.1 should be stricken because that provision does not apply to a municipality. That argument has been rejected. The City's motion to strike the prayer for damages under § 52.1 is DENIED.

The Individual Defendants argue that the prayer for damages under California Government Code § 815.6 should be stricken because that provision, on its face, applies only to "the public entity." This is indisputably true, but nonetheless does not warrant striking this prayer from the FAC. The prayer applies broadly to all claims in the case and has possible bearing on the subject matter of the litigation. Individual Defendants' motion to strike the punitive damages allegation is DENIED.

Somewhat more pertinent is the City's argument that § 815.6 does not set forth any statutory damages, as recoverable damages are those "proximately caused by its failure to discharge the duty..." Doc. 38-1 at 25. But this, at best, would serve as a ground for striking the words "statutory damages" from the prayer. *De minimis non curat lex*. This motion is DENIED.

//

//

//

50

**5.      Request to Strike Fifth Amendment Allegations.**

Individual Defendants move to strike the entire cause of action for violation of due process under the Fifth Amendment to the extent that the court has not granted the related motion to dismiss. As that aspect of the motion to dismiss has been granted, the Court need not address this aspect of the motion to strike.

## IV. CONCLUSION

The Court, the busiest in the nation, has been seriously hampered by the quality (or lack thereof) of the briefing on many of the key issues in this case. All Parties are guilty of citing inapplicable and omitting obviously relevant authorities. If this case is to proceed in an efficient manner, this conduct will cease. If it does not, the Court will exercise remedies available to it.

For the reasons set forth above:

1.      The City's motion to dismiss the Section 1983 claims on the ground that the FAC fails to satisfy *Monell*:

- is GRANTED WITHOUT LEAVE TO AMEND as to any official policy claim;

- is GRANTED WITH LEAVE TO AMEND as to any longstanding practice or custom claim;

- is DENIED as to any official policymaker claim;

2.      All Defendants' motions to dismiss the Section 1983 claims based upon:

- Fifth Amendment due process are GRANTED WITHOUT LEAVE TO AMEND;

- Fourteenth Amendment substantive due process are DENIED;

- Fourteenth Amendment procedural due process are DENIED;

- Fifth Amendment takings are GRANTED WITHOUT LEAVE TO AMEND, although Plaintiff may file a motion to amend setting forth relevant California authorities if Plaintiff believes California caselaw demands a different conclusion;

51

- Equal Protection are:
  - ○ GRANTED WITHOUT LEAVE TO AMEND as to any claim based upon classification of the homeless as a protected class;
  - ○ GRANTED WITHOUT LEAVE TO AMEND as to any claim based upon impingement of the fundamental right to travel;
  - ○ DENIED as to any claim based upon impingement of the fundamental right to life/bodily integrity;
  - ○ GRANTED WITHOUT LEAVE TO AMEND as to any claim based upon discrimination without any legitimate rational basis;

3. The Individual Defendants' motion to dismiss the individual capacity claims is GRANTED WITHOUT LEAVE TO AMEND, although this does not entitle them to dismissal from the lawsuit, as the FAC states claims against them in their individual capacities;

4. All Defendants' motions to dismiss the California Constitutional Claims are GRANTED WITHOUT LEAVE TO AMEND as to any damages claim based upon the California Constitution; as to all other requested forms of relief based upon the California Constitution, the motions are DENIED;

5. All Defendants' motions to dismiss any equal protection claim brought under the California Constitution based upon impingement of the fundamental right to life/bodily integrity are DENIED; as to all other equal protection claims, the motions are GRANTED WITHOUT LEAVE TO AMEND;

6. The City's motion to dismiss the Bane Act claim on the ground that the Bane Act cannot be applied to a municipality is DENIED;

7. Individual Defendants' motion to dismiss the Bane Act claim is GRANTED WITH LEAVE TO AMEND;

52

8.      The City's motion to dismiss the tort claims against it is GRANTED WITH LEAVE TO AMEND for failure to allege compliance with the California Tort Claims Act;

8.      The Individual Defendants' motion to dismiss the conversion claim is DENIED;

9.      To the extent the FAC asserts Individual Defendants should be liable for the conduct of others, Individual Defendants' motion to dismiss the tort claims pursuant to Cal. Gov. Code § 820.7 is GRANTED; as to all other asserted statutory immunities, the motion is DENIED;

10.     Defendants Swearengin, Scott, Rudd and Barfield's motion to dismiss the contract claim on the ground that they are not signatories to the Settlement Agreement is DENIED;

11.     Individual Defendant's motion to dismiss the Cal. Civ. Code § 2080 claim is GRANTED WITHOUT LEAVE TO AMEND;

12.     The motion for a more definite statement is DENIED IN ITS ENTIRETY; and

13.     The motion to strike is DENIED IN ITS ENTIRETY.

Any amended complaint shall be filed on or before January 28, 2013.

**SO ORDERED**
**Dated: December 26, 2012**

                              **/s/ Lawrence J. O'Neill**
                              **United States District Judge**