# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LUIS SANCHEZ, ANGELITA SOTO, GLORIA WILLIAMS, THERESA CALMER, JUAN FERNANDEZ, MELISSA OHLER, and JOSHUA DEEN,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**CITY OF FRESNO, ASHLEY SWEARENGIN, MARK SCOTT, BRUCE RUDD, GREG BARFIELD, JERRY DYER, PHILLIP WEATERHS, MALCOLM DOUGHERTY, and DOES 1-100, inclusive,**<br><br>**Defendants.** | **1:12-CV-00428-LJO-SKO**<br><br>**MEMORANDUM DECISION AND ORDER RE CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT/ SUMMARY ADJUDICATION (DOCS. 107 & 111)** |

## I. INTRODUCTION

Plaintiffs, current or former homeless residents of the City of Fresno ("City"), allege that their personal property, including property necessary for survival, essential to health, and of personal and emotional value, was seized and immediately destroyed as part of the City's efforts to clean up[1] homeless encampments in Downtown Fresno in late 2011 and early 2012. This case is one of more than thirty similar cases filed by homeless individuals arising out of these cleanup activities, all of which have been consolidated for pretrial purposes, with the above-captioned matter serving as the lead case. *See* Doc. 27. Before the Court are cross motions for summary judgment. Docs. 107 & 111. As indicated in a previous Order, Doc. 98, the Court decides these cross motions on the record without a hearing, pursuant to Local Rule 230(g).

---

[1] The Court recognizes that the parties use various terms to describe the City's actions, including "cleanup," "dismantle," and "destroy." By adopting the term "cleanup" for purposes of this motion, the Court does not express any opinion as to the nature or lawfulness of the activities in question.

1

## II. BACKGROUND[2]

In 2006, the City was sued in a class action lawsuit brought on behalf of homeless individuals. *Kincaid v. City of Fresno*, 1:06-cv-1445 OWW. During the pendency of that action, the City adopted Administrative Order 6-23 ("AO6-23"),[3] a formal written policy addressing cleanups in and around areas of homeless encampments. Defendants' Statement of Undisputed Fact ("DSUF") #1.[4] As part of the global settlement of the *Kincaid* case, the City agreed it would comply with AO6-23 for at least five (5) years and that this Court would retain jurisdiction to enforce the parties' settlement during that time. DSUF #2.

In 2010 and 2011, the City received complaints from individuals, businesses, and service providers about homeless encampments that had developed in an area of downtown Fresno, south of Ventura Street, between Santa Fe and E Streets (the "Area"). DSUF #3; Doc. 107-12, Barfield Decl. ¶ 6. During this time period, there was significant criminal activity, including violent crime, in the Area. Doc. 107-13, Dyer Decl. ¶ 3. At least one City official observed "the areas in and around the encampments, and saw that many of the homeless were living in deplorable, fetid conditions, in shelters which reeked of human feces and urine, and which had piles of accumulated trash and rotting garbage." Doc. 107-11, Garner Decl. ¶¶ 4-5.

In July 2011, the Fresno Housing Authority conducted what is known as a P-4 Survey of homeless persons in Fresno, which recorded some details about a surveyed person's housing situation, health concerns, and experience with violent crime. Joint Statement of Undisputed Fact ("JSUF"), Doc. 105, #4. In early 2011, the City began to plan for the removal of the homeless encampments in the Area.

---

[2] Because on summary judgment the evidence of the non-moving party is assumed to be true and disputed facts are construed in the non-movants favor, the Court sets forth the undisputed facts and notes those disagreements of fact that are relevant to this decision. Numerous evidentiary objections are embedded in the parties' responses to statements of undisputed fact. The Court has reviewed all such objections and finds them to be immaterial or without merit unless a specific finding to the contrary is contained within this memorandum decision and order.

[3] The Court takes judicial notice of AO6-23, an Administrative Order issued by the City and publicly available on its website. *See* Doc. 161-3, Ex. GG;  http://www.fresno.gov/NR/rdonlyres/870F10CF-F19D-486B-8673-301F88981753/0/623GarbageRemovalCleanupofTemporarySheltersandCodeEnforcementAbatementProcedures.pdf (last visited May 16, 2014).

[4] Defendants' Statement of Undisputed Fact was filed as Doc. 107-2. Plaintiffs filed a response. Doc. 167. Defendants filed a reply, which incorporates all three filings. Doc. 169-2. Whenever the Court references the DSUF, it is referring to the reply.

2

Plaintiffs' Response to DSUF ("PRDSUF") #4; Barfield Depo. 37:18-39:18. It is undisputed that the City scheduled cleanups within the Area to commence October 27, November 11, and November 7, 2011. DSUF #7.[5] One such cleanup was postponed until December 8, 2011 to accommodate a homeless church. *Id.* The City posted notice of the clean-up commencement dates 21-28 days in advance. DSUF #8. The notices were posted in both English and Spanish, identifying the geographic areas that would be the subject of the clean-ups and indicating that the City would "conduct a clean-up of the area, including the removal of all individuals, personal property, temporary shelters, junk and/or garbage...." *Id.*[6] City crews monitored the Area on a daily basis and reposted the notices as needed. *Id.*

It is also undisputed that the City requested that the Housing Authority and other service providers staff a resource center on the corner of Santa Clara and G Streets, so that individuals impacted by the clean-ups could receive information about potential sources of housing and/or other resources. DSUF #10. The City maintains that the weather during the period October 27-November 8, 2011, when the "vast majority" of the clean-ups occurred ranged from 48°-80° F and that there was "extremely limited precipitation." DSUF #13. However, the temperatures in December occasionally dropped below freezing into the low 30°Fs. Plaintiffs' Request for Judicial Notice ("PRJN"), Doc. 163-1.[7]

The City rented four storage containers in which to place any property of the homeless it stored during the removal of homeless shelters that began in October 2011. JSUF #14. On November 7, 2011, a temporary shelter claimed by Plaintiff Angelita Soto was disposed of by the City. JSUF ## 10, 12. On November 8, 2011, the City disposed of a tent claimed by Plaintiff Steven Ward. JSUF ## 9, 11.

Following the clean-ups, the City permitted homeless individuals to sleep in the Area at night, but required that shelters be disassembled during the daytime. DSUF #14. Plaintiffs do not dispute this,

---

[5] Plaintiffs do not dispute this fact but point out that Defendants' conduct also took place on November 2 and 8 and on several dates in December, for which no notice was given. PRDSUF #7. The extent to which the notices given were sufficient to warn that clean ups might occur on these additional dates is a legal question that will be addressed as necessary.

[6] Plaintiff disputes that this constituted adequate notice that Defendants intended to destroy all shelters and their entire contents. PRDSUF #8. This is a legal inquiry, not a factual dispute, and will be addressed as necessary.

[7] The weather information provided by Plaintiffs, taken from the National Climate Data Center and not disputed by Defendants, is a proper subject of judicial notice, as the information contained therein can be determined from sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201.

but maintain that it is not possible to erect shelters that provide as much protection from the elements and other dangers on a nightly basis. PRDSUF #14.

## III. <u>STANDARD OF DECISION</u>

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citation and quotation omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

If the moving party would bear the burden of proof on an issue at trial, that party must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence to support the non-moving party's case." *Id*. When the moving party meets its burden, the non-moving party must demonstrate that there are genuine disputes as to material facts by either:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).

In ruling on a motion for summary judgment, a court does not make credibility determinations or

4

1   weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be

2   believed, and all justifiable inferences are to be drawn in his favor." *Id*. Only admissible evidence may

3   be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2). "Conclusory,

4   speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and

5   defeat summary judgment." *Soremekun*, 509 F.3d at 984.

6   ## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

7   **A.    Summary of Motion.**

8         Defendants Ashley Swearengin, Mark Scott, Bruce Rudd, Greg Barfield, Jerry Dyer, Phillip

9   Weathers, Gregory Garner, Raul Bombardly, Luis Castellanos, Su Fang, and Rick Medizabal

10  ("Defendants") move for summary judgment that: (1) Plaintiffs cannot prevail on their claims arising

11  under 42 U.S.C. § 1983 ("Section 1983") based upon substantive due process and/or the equal protection

12  clause; (2) Individual Defendants are entitled to qualified immunity in connection with Plaintiffs'

13  Substantive Due Process and/or Equal Protection claims; (3) Plaintiffs cannot prevail on their parallel

14  substantive due process and equal protection claims under Article I, Section 7 of the California

15  Constitution; and (4) Defendants are entitled to summary judgment on Plaintiffs' claims for intentional

16  infliction of emotional distress as well as on Plaintiffs Subia's and Ward's claims under California Civil

17  Code Section 52.1. Doc. 107-1.

18  **B.    Evidentiary Objections.**

19         Plaintiffs object to certain evidence submitted by Defendants in support of their summary

20  judgment motion. Doc. 168. The Court has reviewed the objections and rules as follows:

| Evidence Objected To | Basis for Objection | Ruling |
|---|---|---|
| Swearengin Decl. ¶ 6:5-7 (stating that City received complaints regarding homeless encampments) | Hearsay. | OVERRULED as moot. Similar, non-hearsay evidence is provided by another witness, namely Greg Barfield. |
| Swearengin Decl. ¶ 6:11-12 (describing "deplorable conditions" within encampments) | Hearsay | OVERRULED as moot. Similar, non hearsay evidence is provided by Greg Barfied. |
| Swearengin Decl. ¶ 10 (describing presence of City's counsel at clean ups) | City has refused to provide discovery or respond to questions about the planning of the cleanups on the grounds of attorney client | The Court declines to rule on the admissibility of this evidence, finding this statement irrelevant to the present motions. |

| | | privilege. |
|---|---|---|
| Swearengin Decl. ¶ 11 (describing weather during applicable time period as "mild" and her belief that the weather did not pose an "unreasonable risk" to any resident of the encampments) | Lack of personal knowledge. | SUSTAINED. Declarant does not establish personal knowledge of the historical weather conditions on the dates in question. Declarant is offering improper opinion testimony on a legal issue by offering assertions about whether such weather posed an "unreasonable risk." |
| Swearengin Decl. ¶ 12 (explaining that "in light of the totality of the circumstances, including the City's efforts to provide advance notice of the 2011 clean-ups, and efforts to conduct these clean-ups in compliance [with AO6-23], I did not believe the clean-ups, or my involvement in the clean-ups, exposed the residents of the encampments to a risk of harm); Rudd Decl. ¶ 2 (substantially the same as Swearengin Decl. ¶ 12); Garner Decl. ¶ 11 (same); Fang Decl. ¶ 10 (same); Barfield Decl. ¶ 8 (same); Mendizabal Decl. ¶ 2 (same); Bombardly Decl. ¶ 2 (same); Scott Decl. ¶ 2 (same); Castellanos Decl. ¶ 2 (same); Weathers Decl. ¶ 2 (same); and Dyer Decl. ¶ 2 (same). | Lack of personal knowledge. | The Court declines to rule on the admissibility of this evidence, finding this statement irrelevant to the present motions. |
| Garner Decl. ¶ 5 (stating that City received complaints regarding homeless encampments) | Hearsay. | OVERRULED as moot. Similar, non-hearsay evidence is provided by another witness, namely Jerry Dyer. |
| Fang Decl. ¶ 9 ("As the supervisor for a clean-up crew, I was aware of the weather conditions we experienced during the clean-ups. The weather in the Fresno area for the period of October 27 – December 8, 2011, was mild and normal for fall weather. As referenced above, the vast majority of the clean-ups were completed between October 27 – November 8, 2011, during which time we had normal fall weather conditions, with temperatures ranging between 48 – 80 degrees. There was very little precipitation in the area during this time period.) | Lack of personal knowledge concerning what weather would be "normal" for the time period in question. | The Court declines to rule on the admissibility of this evidence, as Declarant's statement that the weather was "normal" is not relevant. |
| Trost Decl. ¶ 4 (explaining that representatives of the City were present at the cleanups to ensure compliance with AO6-23) | Lack of personal knowledge. | The Court declines to rule on the admissibility of this evidence, finding this statement irrelevant to the present motions. |

Defendants likewise interpose numerous objections to evidence submitted by Plaintiffs in support of their summary judgment motion. Doc. 171-1. The Court has reviewed the objections and rules as follows:

| Evidence Objected To | Basis for Objection | Ruling |
|---|---|---|
| Soto Decl. ¶ 3, p. 3:20-26. | Lack of foundation for speculative statements such as: "They were all very intimidating to me. There was nothing I could do.... The City crews and police did not care about me or my property." Hearsay as to | Foundational objection OVERRULED. These are first person statements reflecting first person experiences and impressions. There is no lack of foundation. |

| | statement that "we could not cross the tape." | Hearsay objection is OVERRULED insofar as the statement "[t]hey put up yellow tape and told us that we could not cross the tape" is not offered for the truth, but to establish why declarant did not retrieve her belongings. |
|---|---|---|
| Soto Decl. ¶ 5 in its entirety (statements about feeling safe inside "small home" where declarant could be protected from the wind and rain) | Lack of foundation; relevance. | The Court finds these statements are not relevant to the present motions, but notes objections on grounds of relevance are "duplicative of the summary judgment standard itself" because "a court can award summary judgment only when there is no genuine dispute of <u>material</u> fact." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)(emphasis added). |
| Soto Decl. ¶ 6, p. 4:21-5:4 (explaining that declarant was suffering from depression and bipolar disorder but that prior to the cleanups both problems had improved; after the destruction of her home both conditions worsened) | Improper lay opinion. | SUSTAINED. Pursuant to Fed. R. Evid. 701, lay witness testimony is permitted only when such opinions are not based on scientific, technical, or otherwise specialized knowledge. A lay witness cannot testify as to any cause and effect relationship between her housing situation and asserted worsening of psychiatric conditions. |
| Soto Decl. ¶ 6: (statement that the City's destruction of her small home, furniture, and most of her possessions left her "vulnerable") | Conclusory; lacks foundation. | OVERRULED. This comment is neither conclusory nor lacking in foundation. It is declarant's first person account of her own experiences. |
| Soto Decl. ¶ 6: (statement that declarant had no place to go) | Contradicts sworn testimony cited in Doc. 171-1 at 3:3-4. | OVERRULED. The cited deposition testimony, which explains that while declarant did have some housing options she found them unacceptable for various reasons, is not in <u>direct</u> conflict with declarant's general statement that she had "no place to go." The sham affidavit rule may be invoked only if a district court makes "a factual determination that the contradiction was actually a sham" and "the inconsistency between a party's deposition testimony and subsequent affidavit ... [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir.2009). This conflict goes to weight, not admissibility. |
| Soto Decl. ¶ 7 in its entirety (comments about medical conditions) | Improper lay opinion. | SUSTAINED. Pursuant to Fed. R. Evid. 701, lay witness testimony is permitted only when such opinions are not based on scientific, technical, or otherwise specialized knowledge. This lay witness cannot testify as to the cause and effect relationship between her housing situation and any asserted medical conditions. |
| Soto Decl. ¶ 7 (statements regarding weather in December) | Irrelevant. | OVERRULED. Defendants fail to explain why this comment is irrelevant. |
| Soto Decl. ¶ 7: (statement that declarant had no place to live but in the street) | Contradicts sworn testimony. | OVERRULED. The cited deposition testimony, which explains that while declarant did have some housing options she found them unacceptable for various reasons, is not in <u>direct</u> conflict with declarant's general statement that she had |

| | | |
|---|---|---|
| | | "no place to live but in the street." (See explanation of sham affidavit rule above.) |
| Soto Decl. ¶ 8: in its entirety (statements about dangers of being a woman living on the street) | Speculative and improper lay opinion. | OVERRULED. This testimony is admissible because it is based upon the witnesses' own personal observations and recollections of concrete facts. *United States v. Beck*, 418 F.3d 1008, 1015 (9th Cir. 2005). |
| Soto Decl. page 6 in its entirety | Failure to serve. | SUSTAINED. The sixth page of this Declaration is not part of the record. |
| Soto Decl. page 7 (statements regarding lack of records related to storage of her property after cleanup and indicating that "nothing belonging to [declarant] had been stored by the City of Fresno when it was destroying the homeless shelters in my area") | Speculation; lack of foundation. | OVERRULED. Declarant claims to have personal knowledge of the facts underlying these statements. |
| Ward Decl. ¶ 3, p.2:14-21 (describing photographs of declarant's tent shelter, the content of that shelter, his knowledge that the City cleaned up the area on November 8, and his knowledge regarding the possessions of another person, who has since passed away). | Speculation; lack of personal knowledge regarding messiness of scene, conduct of City or its employees, contents of the pictured tent, or the reference to Kathy's passing. | OVERRULED. This testimony is not speculative as to the content of declarant's own tent; the fact that the picture of the tent is messier than his recollection of the scene; his understanding of the City's actions. This testimony is also based upon declarant's personal knowledge, even if that knowledge was gained from "others in the area." Evidence about Kathy's belongings and her passing is irrelevant so the court declines to address the objection as to any such evidence. |
| Ward Dec. ¶ 5, p. 3:4-9 (describing returning to the area where he left his tent shelter on the afternoon of November 8 to find everything was gone; explaining the impact this had on him) | Lack of foundation regarding conduct of City; Declarant's state of mind is irrelevant. | OVERRULED as to lack of foundation for statement that declarant "learned that City of Fresno crews had come through the area and destroyed whatever was there whose owner was not there to move it." Declarant claims to have learned of the City of Fresno's actions from others. Therefore, this statement does not lack foundation.<br><br>OVERRULED as to the relevance of Declarant's state of mind. The Court finds that this information is arguably relevant to the harm element of the Intentional Infliction of Emotional Distress claim. (The Court expresses no opinion at this stage on whether declarant's IIED claim is otherwise viable.) |
| Ward Decl. ¶ 6, p. 3:13-17 (Declarant explains that after the clean ups, declarant was shown pictures of his tent being destroyed; he identifies his tent and states that it is being taken to the garbage truck zipped and containing all of his possessions. Declarant also states that he "later" went to the City's storage containers to find his belongings and found none.) | Lack of foundation regarding conduct of City or contents of pictured tent | OVERRULED as to all statements in this paragraph, which are based upon personal knowledge. |
| Ward Decl. ¶ 7 (stating that he caught a very bad cold or flu while sleeping "out in the cold on the sidewalk"; explaining that he had symptoms of headache, | Improper lay opinion. | OVERRULED as to declarant's statements about contracting a "bad cold or flu." These are essentially descriptions of symptoms for which no medical |

| | | |
|---|---|---|
| chills, aches and pains; that he could not get dry at night because he had no shelter; and that his lack of shelter caused him to "stay sick for quite a while.") | | expertise is required.<br><br>SUSTAINED as to his opinion that his personal living situation caused or prolonged his illness. This does require medical expertise. |
| Ward Decl. ¶ 7 (claiming that he stayed sleeping on sidewalk for the rest of November and most of December 2011) | Contradicts sworn deposition testimony that within a couple of weeks of the clean up he was provided housing. | OVERRULED as to application of the sham affidavit rule. While there is some conflict between the cited deposition testimony, in which deponent states he was provided housing within several weeks of the clean-up, this goes to weight not admissibility of more general statement in declaration. |
| Ward Decl. ¶ 8 (stating that the City destroyed his tent again in December 2011) | Lack of foundation. | OVERRULED. Declarant previously established he learned of City's role in destruction of his tent from others. No hearsay objection has been raised, so any such objection is waived for purposes of this motion. |
| Ward Decl. ¶ 8 (comments about medical condition) | Improper lay opinion. | SUSTAINED as to opinion that exposure to cold and wet worsened his cold and flu. Medical expertise is needed to render such an opinion. |
| Ward Decl. ¶ 9 in its entirety (comments about claimed illnesses and causes of the same) | Improper lay opinion. | OVERRULED as to descriptions of his own symptoms; SUSTAINED as to statements about cause and effect relationship between symptoms/illnesses and living situation. |
| Ward Decl. ¶ 10 in its entirety (comments about likelihood of being attacked while sleeping out at night) | Lack of foundation; irrelevant opinion testimony because it is undisputed that he was not attacked during the operative time period. | Relevance objection SUSTAINED. |
| Ward Decl. ¶ 12 in its entirety (admitting he was not present when his tent was destroyed but asserting that City crews destroyed it; describing his resulting feelings) | Lack of foundation regarding conduct of City; Declarant's state of mind is irrelevant. | OVERRULED. Declarant previously established he learned of City's role in destruction of his tent from others. No hearsay objection has been raised, so any such objection is waived.<br><br>OVERRULED as to the relevance of Declarant's state of mind. The Court finds that this information is arguably relevant to the harm element of the Intentional Infliction of Emotional Distress claim. (The Court expresses no opinion at this stage on whether declarant's IIED claim is otherwise viable.) |
| Ward Decl. ¶ 13 in its entirety (explaining that prior to cleanups City and Housing Authority employees conducted survey; declarant told said employees he was living on the street and had previously been subject to physical attack; indicating that it was the City who "destroyed [his] tent and all [his] possessions.") | Irrelevant and speculative lay opinion testimony regarding conduct attributable to the City. | OVERRULED. This is arguably relevant to the deliberate indifference standard. No hearsay objection has been raised, so any such objection is waived. |
| Subia Decl. ¶ 2, p. 2:2-8 (describing tent shelter utilized before cleanup as well as her belief that the tent was safer than other options) | Speculation/lack of foundation regarding the safety of her shelter; her state of mind is irrelevant. | OVERRULED as to foundational objections. Declarant's statements about the relative safety of her home are rationally based upon the witnesses' own perception, and are not based upon |

| | | scientific, technical, or otherwise specialized knowledge.<br><br>SUSTAINED as to the relevance of Declarant's state of mind. The Court finds that this information is not relevant to any issue raised in these motions. |
|---|---|---|
| Subia Decl. ¶ 3, p 2:11-13, 14-21, 24-26 (describing day of cleanup and destruction of her and her husband's tent shelter; explaining that, according to her husband, City crews destroyed the tent). | Speculation/lack of foundation about conduct attributable to City crews which declarant did not observe. Only information regarding claimed loss of property is hearsay. Contradicts sworn deposition, in which she testified that the clean-up crews she observed were from CalTrans. | Hearsay objection SUSTAINED as to any statements regarding whether the City destroyed her tent. Declarant does not claim to have any first person knowledge of who destroyed her property. Although declarant's husband informed declarant that it was the City who destroyed her tent. Plaintiffs cannot offer this for the truth.<br><br>It is therefore unnecessary to rule on the related sham affidavit objection. |
| Subia Decl. ¶ 4 in its entirety (explaining that after the cleanup, she and her husband used a tarp as shelter for several months) | Speculation/lay opinion that lacks foundation regarding the safety of her tent. Contradicts sworn testimony that following the clean-ups she assembled and disassembled her tent on a nightly basis. | Speculation/lay opinion objection OVERRULED. Declarant's statements about the relative safety of her home are rationally based upon the witnesses' own perception, and are not based upon scientific, technical, or otherwise specialized knowledge.<br><br>SUSTAINED as to sham affidavit rule. The statements in this paragraph of the declaration are directly contradicted by declarant's deposition testimony, in which declarant stated she and husband set up a tent almost every night after the clean ups. |
| Subia Decl. ¶ 5 in its entirety (explaining that her living situation worsened her medical conditions) | Improper lay opinion regarding medical conditions purportedly caused by clean-ups. | OVERRULED as to description of symptoms and timing thereof.<br><br>SUSTAINED as to opinion that exposure to cold and wet worsened symptoms and caused trip to emergency room and that exposure to the elements led to her depression worsening. |
| Subia Decl. ¶ 6 in its entirety (asserting that the City destroyed her home and all possessions; describing that living situation worsened her existing cancer and thyroid conditions). | Speculation/lack of foundation regarding conduct attributable to the city. Same is also vague and ambiguous as to time. Medical diagnosis is improper lay opinion. | Lack of foundation objection SUSTAINED as to assertions that City destroyed her home. Declarant does not explain the basis for her assertion and hearsay objection to statement that her husband told her the City destroyed the tent was previously sustained.<br><br>SUSTAINED as to statements about cause and effect relationship between symptoms/illnesses and living situation. |
| Subia Decl. ¶ 7, p. 4:4-9 (generalized statements similar to those in paragraph 6). | Speculation/lack of foundation regarding conduct attributable to the City. Improper lay opinion testimony regarding medical conditions. | Same ruling as directly above. |
| Subia Decl. ¶ 8 in its entirety (elaboration on the information discussed in paragraphs 6 and 7 as well | Speculation/lack of foundation regarding conduct attributable to the City. Improper lay opinion | Same ruling as directly above as to lack of foundation and improper lay opinion testimony. |

| | | |
|---|---|---|
| as discussion of how these events made her feel) | testimony regarding medical conditions. Declarant's state of mind irrelevant. | OVERRULED as to the relevance of Declarant's state of mind. The Court finds that this information is arguably relevant to the harm element of the Intentional Infliction of Emotional Distress claim. |
| Deposition of Angelita Soto 21:16-23:21 (describing how City workers threw away property in grocery carts on December 7) | Speculation/conclusory regarding loss of items on December 7, 2011. | OVERRULED. The Court cannot identify and Defendants do not point to any specific portion of this testimony that is speculative or conclusory. |
| Deposition of John Sunda 31:1-20; Deposition Ex. 78 (stating that on 12/15/11, he went to a location the police cleaned out three weeks prior) | Relevance. Deponent was a private party present on Santa Clara Avenue on December 15, 2011 to collect shopping carts. None of Plaintiffs' claims arise out of any act occurring on Santa Clara Avenue on this date. | SUSTAINED. The Court does not believe this evidence – a third party's subjective opinion of clean-ups not at issue in the present motions – is relevant to any issue raised in the present motions. |

**C.**     **Section 1983 Substantive Due Process Claim.**

     **1.     Scope of the Substantive Due Process Claim.**

     Defendants previously moved to dismiss any Substantive Due Process claims in the First Amended Complaint on the ground that the facts alleged in support of the claim were more appropriately evaluated under the construct of the Fourth Amendment. Doc. 38-1 at 10. In its December 26, 2012 Memorandum Decision and Order ("December 26, 2012 Order") addressing that motion, this Court reasoned:

> Where government behavior is governed by a specific constitutional amendment, claims under section 1983 alleging unlawful government action must be evaluated under that specific constitutional provision, rather than under the rubric of "substantive due process." *Graham v. Conner*, 490 U.S. 386, 395 (1989); *Albright v. Oliver*, 510 U.S. 266, 273 (1994); *see also Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) (refusing to acknowledge a Fourteenth Amendment liberty interest in entering a polling place wearing political buttons, instead evaluating arrest for such conduct under the Fourth Amendment). Defendants maintain that Plaintiff has failed to explain how the alleged violation of his due process rights is any different from the alleged violation of his Fourth Amendment rights. Doc. 38-1 at 10.
>
> The key inquiry is whether the more particular Amendment (in this case the Fourth) "provides an explicit textual source of constitutional protection against a particular sort of government behavior." *Albright*, 510 U.S. at 273 (internal citations and quotations omitted). Here, some of the government conduct alleged in the FAC arguably falls within the purview of the Fourth Amendment's prohibition against unreasonable searches and seizures. *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027-30 (9th Cir. 2012) (holding that the City's immediate destruction of homeless

11

individuals' personal property constituted an unreasonable seizure under
the Fourth Amendment). It is therefore appropriate to evaluate that same
conduct (the alleged seizure) under the Fourth Amendment, rather than the
Fourteenth Amendment.

Doc. 46 at 14-15. However, as this Court previously pointed out, "the allegations ... do not stop at the

seizure itself." *Id*. at 15.

### 2.   <u>**Substantive Due Process/Danger Creation Doctrine Generally.**</u>

The December 26, 2012 Order summarized the applicable general substantive due process

standards:

> Under substantive due process jurisprudence, the Fourteenth Amendment
> "guarantees more than fair process, and the 'liberty' it protects includes
> more than the absence of physical restraint." *Washington v. Glucksberg*,
> 521 U.S. 702, 719 (1997). In this conception, due process encompasses
> certain "fundamental" rights. *Reno v. Flores*, 507 U.S. 292, 301–302
> (1993). Substantive due process also "forbids the government from
> depriving a person of life, liberty, or property in such a way that shocks
> the conscience or interferes with the rights implicit in the concept of
> ordered liberty." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009)
> (internal citations and quotations omitted). The substantive component of
> the Due Process Clause is violated by executive action only when it "can
> properly be characterized as arbitrary, or conscience shocking, in a
> constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128
> (1992).

***

> "The protections of substantive due process have for the most part been
> accorded to matters relating to marriage, family, procreation, and the right
> to bodily integrity." *Albright*, 510 U.S. at 272. The Fourteenth
> Amendment's due process clause "provides heightened protection against
> government interference with certain fundamental rights and liberty
> interests." *Glucksberg*, 521 U.S. at 720 (1997). Courts are instructed to
> resist the temptation to augment the substantive reach of the Fourteenth
> Amendment, "particularly if it requires redefining the category of rights
> deemed to be fundamental." *Bowers v. Hardwick*, 487 U.S. 186, 195
> (1986), overruled on other grounds, *Lawrence v. Texas*, 539 U.S. 558
> (2003).

> There is no fundamental right to housing, *Lindsey v. Normet*, 405 U.S. 56
> (1972), but this case does not merely address Plaintiff's lack of access to
> shelter. The FAC's allegations arguably trigger application of a series of
> cases that provide for liability under substantive due process where a state
> or local official acts to place an individual in a situation of known danger
> with deliberate indifference to their personal, physical safety. This
> doctrine is spelled out in detail in *Kennedy v. City of Ridgefield*, 439 F.3d

1055 (9th Cir. 2006). The plaintiff in *Kennedy* contacted Ridgefield police to report that a thirteen year-old neighbor had molested her nine year-old daughter. At the time of the report, the plaintiff warned officers that the neighbor had violent tendencies. *Id*. at 1057. The police assured plaintiff that she would be given notice prior to any police contact with the neighbor's family about the allegations. *Id*. at 1058. However, in contravention of this promise, the neighbor was informed of the allegations shortly before officers warned plaintiff. *Id*. Later that night, the neighbor broke into plaintiff's home, shot plaintiff, and fatally shot plaintiff's husband. *Id*. Plaintiff alleged that the involved officer violated her Fourteenth Amendment right to substantive due process by placing her in a known danger with deliberate indifference to her personal physical safety. The Ninth Circuit reviewed the applicable standard:

> It is well established that the Constitution protects a citizen's liberty interest in her own bodily security. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 673-74 (1977); *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir.1989). It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action "affirmatively place[s] the plaintiff in a position of danger," that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced. *DeShaney v. Winnebago County Dep't of Soc. Serv.*, 489 U.S. 189, 197, 201 (1989); *Wood*, 879 F.2d at 589-90.
>
> This circuit first recognized such "danger creation" liability in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). In *Wood*, a state trooper determined that the driver of an automobile was intoxicated, arrested the driver and impounded the car. The officer's actions allegedly left Wood, a female passenger, stranded late at night in a known highcrime area. Subsequently, Wood accepted a ride from a passing car and was raped. This court held that Wood could claim § 1983 liability, since a jury presented with the above facts could find "that [the trooper] acted with deliberate indifference to Wood's interest in personal security under the fourteenth amendment." *Id*. at 588.
>
> Since *Wood,* this circuit has held state officials liable, in a variety of circumstances, for their roles in creating or exposing individuals to danger they otherwise would not have faced. *See L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) ("*Grubbs* ") (holding state employees could be liable for the rape of a registered nurse assigned to work alone in the medical clinic of a medium-security custodial institution with a known, violent sexoffender); *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (holding as viable a state-created danger claim against police officers who, after finding a man in grave need of medical care, cancelled a request for paramedics and locked him inside his house); *Munger v. City of Glasgow*, 227 F.3d 1082 (9th Cir. 2000) (holding police officers could be held liable for the hypothermia death of a visibly

> drunk patron after ejecting him from a bar on a bitterly cold night).
> These cases clearly establish that state actors may be held liable
> "where they affirmatively place an individual in danger," *Munger*,
> 227 F.3d at 1086, by acting with "deliberate indifference to [a]
> known or obvious danger in subjecting the plaintiff to it," *L.W. v.
> Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) ("*Grubbs II*").
>
> [*Kennedy*], 439 F.3d at 1061-62 (footnotes omitted). Kennedy delineated a
> two-part test, requiring: (1) official (state) action that affirmatively placed
> an individual in danger; and (2) deliberate indifference to that danger.

Here, Plaintiffs claim Defendants' actions caused Plaintiffs to be exposed to: (1) more dangerous environmental conditions than they would otherwise have faced; and (2) greater threat of physical violence from others in the Area than they would have faced had their shelters not been destroyed. Doc. 162 at 15. Defendants maintain that as to both theories of liability Plaintiffs have failed to demonstrate either (a) official (state) action that affirmatively placed an individual in danger; or (b) deliberate indifference to that danger.

**3.      Threshold Question: Did Each Plaintiff Go Without Shelter After the Cleanups?**

Both of Plaintiffs' theories of danger creation liability -- exposure to dangerous environmental conditions and exposure to the threat of physical violence -- are premised on the factual assertion that Defendants' actions caused Plaintiffs to be without shelter for some period of time after the cleanups.

As to Plaintiff Subia, while she indicated in her Declaration that Defendants destroyed her tent, Subia Decl. ¶ 3, the record reflects that she did not go without shelter after the cleanups. She admitted in her deposition that she and her husband still possessed a tent after the cleanups and set it up "for the night" in various locations. Subia Depo. at 43-44. Plaintiffs do not explain how Plaintiff Subia can possibly maintain a danger creation claim premised upon a lack of shelter based upon these facts.

It is undisputed that Plaintiff Soto had been living in a small wooden shelter prior to the cleanups. Soto Decl. ¶ 2. It is also undisputed that after her shelter was removed by clean-up crews, she slept with "almost no shelter ... basically unprotected for about two months, through November and December 2011." *Id*. at ¶ 6.

Plaintiff Ward was living in a tent in the Area prior to the cleanups. Ward Decl. ¶ 2. After his

14

tent was removed during the cleanups, it is undisputed that Ward slept on the sidewalk with no shelter for at least several nights. *Id.* at ¶ 7. In his Declaration, he claims that this pattern continued for the rest of November and most of December 2011. *Id.* In his Deposition, however, he indicates that he obtained housing within a "couple of weeks" of the cleanups. Ward Depo. at 23. Nevertheless, on the current record, it is undisputed that he spent those "couple of weeks" on the sidewalk without shelter.

Accordingly, the Court will evaluate only Soto's and Ward's danger creation claims.

### 4.   Did Defendants Affirmatively Place Plaintiffs In Danger?

First, the Court must determine whether Defendants affirmatively placed Plaintiffs in danger. *Kennedy* articulated the relevant general standard:

> In examining whether an officer affirmatively places an individual in danger, [a court does] not look solely to the agency of the individual, nor [should it rest its] opinion on what options may or may not have been available to the individual. Instead, [the court must] examine whether the officer left the person in a situation that was more dangerous than the one in which they found him.

*Id.* at 1062 (internal citations and quotations omitted).

Defendants argue that they could not possibly have placed Plaintiffs in danger by destroying their shelters because alternative shelter was available through various organizations and entities. *See* Doc. 107-1 at 11-12. According to *Kennedy*, a court should not rest its application of the danger creation doctrine on evidence that a plaintiff may have "options" -- presumably ones that would lessen the potential danger.[8] Rather, the key question is whether Defendants' destruction of Plaintiffs' shelters left Plaintiffs in situations that were more dangerous than the ones in which Defendants found them.

Defendants likewise point to the following quotation from the U.S. Supreme Court's seminal *DeShaney* decision, in an apparent attempt to demonstrate that the danger creation doctrine does not

---

[8] Defendants cite out-of-circuit authority for the proposition that the Court should consider a plaintiff's ability to take action to avert the asserted danger. For example, the Fifth Circuit stated in *Johnson v. Dallas Indep. Sch. Dist*, 38 F.3d 198, 201 (5th. Cir. 1994), that a defendant in a danger creation case must be found to have "affirmatively place[d] an individual in a position of danger, effectively stripping a person of his/her ability to defend [themselves], or cutting off potential sources of private aid." But, *Johnson* did not apply the "stripping a person of his/her ability to defend [themselves], or cutting off potential sources of private aid" language, nor did the *pre-DeShaney* case upon which *Johnson* relied, *Wideman v. Shallowford Cmty. Hosp., Inc.,* 826 F.2d 1030, 1035 (11th Cir. 1987), which in turn relied upon other *pre-Deshaney* cases that are not even remotely factually analogous to the present circumstances.

15

apply where the plaintiff retains free will (as opposed to situations, for example, in which a plaintiff is intoxicated): "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200. But, Defendants fail to note (or, perhaps, to notice) that this quotation from *DeShaney* originates in a section of that opinion discussing the "custodial relationship" exception, not the portion of *DeShaney* that eventually birthed the "danger creation" exception.[9] Within the construct of a "custodial relationship," it is no surprise that the Supreme Court would acknowledge that the state actor's duty arises in part from limitations it has imposed upon an individual's freedom to act on his own behalf. It is undisputed that the custodial relationship exception does not apply here. Therefore, the quoted language from *DeShaney* is not controlling.

More relevant to this case is the Ninth Circuit's analysis in *Campbell v. State of Washington Deptartment of Social & Health Services*, 671 F.3d 839 (9th Cir. 2011). In *Campbell*, state employees who were caring for Justine Campbell, a woman with developmental disabilities, ordered Justine to take a bath, but failed to supervise her, despite being aware that she had previously suffered seizures in the bathtub. *Id* at 839-41, 847. She was later found unconscious in the bathtub, and subsequently died. *Id*. at 839. The Ninth Circuit concluded that the danger creation doctrine did not apply under the circumstances because none of her caretakers "acted affirmatively to place Justine in the way of a danger they had created."

---

[9] Defendants themselves acknowledge that the Ninth Circuit recognizes

> two distinct exceptions to the general rule that the state has no affirmative duty to protect persons from violence inflicted by private actors: (1) the "special relationship" exception, stemming from a custodial relationship between the state and the victim; and (2) the "danger creation" exception, stemming from "affirmative conduct on the part of the state in placing the plaintiff in danger." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992) ("Grubbs I "). The former emanates from language in *DeShaney* itself. *DeShaney,* 489 U.S. at 199–200, 109 S.Ct. 998 ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The latter, more amorphous, doctrine of "state-created danger" was developed by lower courts in response to the DeShaney Court's observation that Winnebago County neither helped to create the dangers that Joshua faced nor rendered him more vulnerable to those dangers. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998 ("While the State may have been aware of the dangers that Joshua faced ... it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

*Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1070 (9th Cir. 2006)

> Indeed, a long bath was one of Justine's favorite activities—one she frequently enjoyed. Justine's death was caused by the dangers inherent in her own physical and mental limitations. Defendants' prior efforts to help keep Justine safe do not render them responsible for creating the danger to which she tragically succumbed....Accordingly, we hold that Defendants did not create the situation—Justine's impairments or her routine bath—that resulted in Justine's death. Their acts were not affirmative acts akin to those found in cases where we recognized a state-created danger. *See Kennedy*, 439 F.3d at 1062 (police confronting a man accused of child abuse by his neighbors without first warning the neighbors, as he had promised to do, after which the alleged child abuser killed two of the accusing neighbors); *Munger*, 227 F.3d at 1086 (police officer ejecting an obviously drunk man from a bar and leaving him outside on a bitterly cold night during which he froze to death); *Penilla*, 115 F.3d at 707 (police officers finding a man in need of serious medical attention, cancelling the man's request for the paramedics, and then locking him in his house, where he died); *L.W.,* 974 F.2d at 119 (state hospital supervisor assigning nurse to work alone with a known, violent sex-offender who raped her); *Wood*, 879 F.2d at 583 (police leaving a woman alone at night in a known high crime area where she was subsequently raped). Justine's death here was tragic and unfortunate. But that does not render Defendants—her government caretakers—liable under § 1983 where Defendants did not put Justine in the way of a harm of their own creation.

*Id.* at 845-47.

Although *Campbell* focused on whether the caretakers had placed Justine "in the way of a harm of their own creation," the danger creation doctrine is also applicable when a defendant does something "to render [the plaintiff] more vulnerable" to a danger. *DeShaney*, 489 U.S. at 201.

The Court declines to rule on whether the facts of this case meet this test because Plaintiffs' remaining danger creation claims fail on other grounds. This body of caselaw is muddled enough without adding advisory opinions to the melee.

### 5.    Did City Defendants Act with Deliberate Indifference?

When deciding whether a defendant in a danger creation case acted with deliberate indifference, a court "must decide the related issues of whether the danger to which the defendant exposed plaintiff was known or obvious, and whether [defendant] acted with deliberate indifference to it." *Kennedy*, 439 F.3d at 1064. Deliberate indifference is a stringent standard of fault, requiring proof of "1) an unusually serious risk of harm, 2) defendant's actual knowledge of (or, at least, willful blindness to) that elevated risk, and 3) defendant's failure to take obvious steps to address that known, serious risk." *L.W. v.*

*Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996) (internal citation and quotation omitted).[10] In addition, a

plaintiff pursuing a danger creation claim must establish that the defendant is the proximate cause of his

or her injuries. *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003); *Kennedy,* 439 F.3d at 1064

n. 5 (harmful event must be foreseeable to defendant in danger creation case). This so-called

"foreseeability analysis" is widely accepted as the conventional analysis for determinations of proximate

cause. *Tahoe–Sierra Preservation Council v. Tahoe Regional,* 216 F.3d 764, 783 n. 34, 785 (9th Cir.

2000), *overruled on other grounds*, *Gonzalez v. Ariz.* 677 F.3d 383, 389 (9th Cir. 2012) (en banc).

### a.      Unusually Serious Risk of Harm.

#### (1)      Threat of Physical Violence.

Several Plaintiffs expressed fear that the removal of their shelters left them more vulnerable to

physical violence at the hands of others. It is undisputed that the Area was a dangerous place. One of the

stated reasons for the cleanups was to address the "significant criminal activity in and around the

homeless encampments, including violent crime." DSUF #3. Plaintiffs Soto and Subia believed that

some form of shelter provided them with additional protection against the threat of physical violence.

Soto Decl. ¶ 8; Subia Decl. ¶4. Plaintiff Stephen Ward explained that he had been attacked before in the

Area. Ward. Decl. at ¶10. He also believed that he was more likely to be attacked if he did not have a

shelter. *Id.*

But it is also undisputed that neither Ms. Soto nor Mr. Ward (nor Ms. Subia, for that matter) was

attacked during the relevant time period. Plaintiffs cannot maintain a Section 1983 danger creation claim

based upon their theory that they were "threatened with a substantially greater risk of assault and loss of

life." *See* Doc. 162 at 14. While there is passing language in the Ninth Circuit's danger creation

jurisprudence that suggests "exposure" to a risk is sufficient, *Campbell*, 671 F.3d at 845 (referring to

liability where a state actor "creates or exposes an individual to a danger which he or she would not have

---

[10] In the Ninth Circuit, contrary to Defendants' assertions, *see* Doc. 107-1 at 12, there is no additional requirement that the
conduct "shock the conscience." *Grubbs*, 92 F.3d at 900.

18

otherwise faced"), the Court has exhaustively examined the body of precedent from within and without this Circuit and has been unable to locate a single example of a court imposing danger creation liability based upon anything other than <u>actual</u>, <u>serious</u> bodily injury. *See, e.g.*, *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 946 (9th Cir. 2012) (gunshot wound victim died after officers refused to let ambulance leave crime scene, rendering officers potentially liable under the danger creation doctrine); *Kennedy v. Richfield*, 439 F.3d 1055, 1058 (9th Cir. 2006) (plaintiff shot after officer informed neighbor of plaintiff's allegations that neighbor had abused plaintiff's children without warning plaintiff as he promised); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086-87 (9th Cir. 2000) (plaintiff died of hypothermia in sub-freezing temperatures after officers ejected victim from a bar late at night); *L.W.*, 92 F.2d at 895-96 (plaintiff was raped after state actors knowingly assigned plaintiff to work alone with a man despite his repeated history of violence against women and girls); *Penilla*, 115 F.3d at 708 (police responded to a 911 call, found plaintiff in urgent need of medical care, canceled the request for paramedics, moved him inside his house, locked the door, and left; he later died); *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989) (plaintiff was raped after state actor stopped vehicle in which plaintiff was a passenger, arrested the driver, impounded the car, and left he passenger stranded in a high-crime area); *Anderson v. Solis*, 2013 WL 245232, *passim* (N.D. Cal. Jan. 22, 2013) (danger creation claim allowed to proceed past summary judgment where plaintiff, an employee at a state-run rehabilitation center, was attacked and pummeled by patient and sustained serious head injuries); *see also Campbel.*, 671 F.3d at 840-41 (plaintiff, a resident at a state residential home for the developmentally disabled, drowned while taking an unsupervised bath; nevertheless, defendants not liable under danger creation doctrine because Defendants did not affirmatively act to put her in harm's way); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 968 (9th Cir. 2011) (developmentally disabled high school student had several sexual encounters with other developmentally disabled student in a school bathroom; yet, danger creation claim could not proceed because teacher did not subject student to known or obvious danger); *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007) (plaintiffs attending Mardi Gras celebration were assaulted an injured by members of a crowd; nevertheless, plaintiffs failed to demonstrate that defendant law

enforcement entities and engaged in affirmative conduct that enhanced the dangers to which plaintiffs exposed themselves to by participating in the celebration); *Estate of Amos ex rel. Amos v. City of Page, Arizona*, 257 F.3d 1086, 1089 (9th Cir. 2001) (plaintiff died after wandering into desert after his car crossed the center line on a highway and collided head on with an oncoming vehicle; police officers were not liable for abandoning search for plaintiff because they played no part in creating the danger to which plaintiff ultimately succumbed); *Cushman v. City of Troutdale*, 2009 WL 890505, *passim* (D. Or. Mar. 30, 2009)(plaintiff was stabbed in the neck by parolee; nevertheless, danger creation claim still not viable because state parole officer did not play a significant role in creating the dangerous situation); *Botello v. Morgan Hill Unified Sch. Dist.*, 2009 WL 3918930, *passim* (N.D. Cal. Nov. 18, 2009)(plaintiff, a student, was physically attacked, suffering skull fracture; nevertheless, danger creation claim could not proceed because state not alleged to have engaged in any affirmative conduct); compare *Cullum v. Teton Cnty.*, 2011 WL 841431, *passim* (D. Idaho Mar. 7, 2011) (plaintiff being struck in the chest three times by fellow municipal employee was not significant enough danger to state claim based upon danger creation doctrine). This Court declines to extend the doctrine beyond its present boundaries. Plaintiffs cannot maintain a danger creation claim based upon the theory that Defendants' conduct exposed them to an added threat of physical violence.

Plaintiffs also attempt to support their danger creation cause of action by arguing they suffered degradation which "caused deep emotional problems from which they HAD suffered to recur." Doc. 162 at 14 (emphasis in original). While at least one case recognizes that an emotional injury might sustain a danger creation claim, the injury must nevertheless be serious. *See Chase v. Cnty. of Nevada*, 81 F. App'x 92, 93 (9th Cir. 2003) (plaintiffs, who were witnesses to a deadly attack at their place of employment, a state run inpatient facility for individuals with behavioral health problems, were so traumatized by event that they could not return to work). Proof of any such serious harm is entirely absent from this record.

### (2)   <u>Environmental Exposure.</u>

Defendants correctly point out that most of the cases applying the danger creation doctrine in the

20

Ninth Circuit concern situations in which the plaintiff's ultimate injury is caused by a third party. *See*

*L.W.*, 974 F.2d at 120 (applying danger creation doctrine where registered nurse was at custodial

institution was raped and terrorized by inmate; nurse was assigned to work, unguarded, in proximity

with the inmate despite employer's knowledge that inmate's record included attacks upon women);

*Ostrander*, 879 F.2d at 586, 588-90 (applying danger creation doctrine when state trooper arrested driver

of vehicle, leaving passenger stranded alone at night in dangerous area and passenger was later raped

after accepting ride from a stranger). Yet, as Defendants' own brief recognizes, numerous other cases

apply the danger creation doctrine where no third party is involved; rather, the danger is created by

circumstances, including weather. For example, in *Munger*, 227 F.3d at 1084, police ejected the

plaintiff, who was heavily intoxicated, from a bar in Glasgow, Montana after he became belligerent with

staff and other patrons. The outside temperature that night in early March was recorded at 11°F, with a

windchill factor of minus 20-25°F. *Id*. Munger wandered away from the bar. *Id*. The following morning,

he was found curled up in an alley two blocks from the bar, dead of hypothermia. *Id*. at 1185. The Ninth

Circuit concluded "that the district court erred in concluding that the officers did not affirmatively place

[decedent] in a position of danger." *Id*. at 1087.

> The officers affirmatively ejected Munger from a bar late at night when the outside temperatures were subfreezing. They knew that Munger was wearing only a t-shirt and jeans, was intoxicated, was prevented by the officers from driving his truck or reentering Stan's Bar, and was walking away from the nearby open establishments. Furthermore, the fact that the officers went looking for Munger (or so claim), demonstrates that they were aware of the danger that he was in. It would seem indisputable, under this version of the facts, that the officers placed Munger "in a more dangerous position than the one in which they found him." [*Penilla v. City of Huntington Park*, 115 F.3d 707, 710 (9th Cir. 1997)]

*Id*.

The more pertinent question here is whether the danger creation doctrine extends to the

conditions experienced by these homeless Plaintiffs. Defendants suggest that the environmental

conditions were simply not extreme enough during the relevant period of time to trigger application of

the danger creation doctrine. According to the undisputed weather data attached to Plaintiffs' Request

for Judicial Notice, low temperatures ranged from 53° F to 38° F, with an average low of 43.9° F, and with temperatures at or below 40° F occurring on eight occasions. Doc. 163-1 at 1. Temperatures in December were lower, with low readings ranging from 40° F to 28° F, with an average low of 32.8° F, and temperatures at or below freezing (32° F) occurring on 17 days. *Id*. at 2. While obviously not as extreme as the temperatures present in *Glasgow*, courts have found similar temperatures to be at least relevant in applying the danger creation doctrine. For example, in *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), police officers intercepted a married couple attempting to make their way home from a Philadelphia bar after midnight in January, on a night when temperatures dropped to or below 34° F, *id*. at 1201, 1203 n.14. Because the wife was so intoxicated, the husband had to carry her part of the way to their apartment. *Id*. at 1201. When they were less than a block from home, police officers stopped the couple. *Id*. Officers permitted the husband to walk home to relieve their babysitter. *Id*. at 1221. He did so, assuming the police would either take his wife to the police station or to the hospital. *Id*. However, officers released the wife to make her way home on her own. She never made it home, and was later found unconscious in a nearby parking lot, having suffered brain damage as a complication of hypothermia. *Id*. The Third Circuit found that a reasonable jury could find harm "was likely to befall the wife" in light of her highly intoxicated state, coupled with the cold weather. *Id*. at 1208.

However, in both *Glasgow* and *Kneipp* there was no dispute that exposure to the elements caused plaintiffs' injuries. Here, by contrast, Plaintiffs have presented <u>no competent evidence connecting any claimed injury to the weather</u>. They claim to have been suffering from various physical and psychiatric conditions, and that these conditions were aggravated by environmental exposure. But the Court has sustained Defendants' objections to any such evidence, as it is presented by lay witnesses attempting to establish a causal connection between environmental exposure and the claimed physical and/or psychiatric conditions. Without competent evidence, Plaintiffs' environmental exposure claim fails for lack of proof.

Defendants' motion for summary judgment on Plaintiffs' Section 1983 Substantive Due Process Claim is GRANTED.

22

**D.    Section 1983 Equal Protection Claim.**

In its December 26, 2012 order, this Court indicated Plaintiffs could maintain a Section 1983 Equal Protection Claim based upon Plaintiffs' Substantive Due Process claim. Doc. 46 at 30-31 (finding that Equal Protection claim could be premised upon fundamental right to bodily integrity). Because Defendants are entitled to summary judgment on Plaintiffs' Section 1983 Substantive Due Process claim and because their Equal Protection claim is contingent upon the Substantive Due Process claim, Defendants' motion for summary judgment on Plaintiffs' Section 1983 Equal Protection Claim is GRANTED.

**E.    Qualified Immunity.**

In light of the above rulings, the Court does not need to reach the issue of whether the individual City Defendants are insulated from liability by qualified immunity as to the section 1983 Substantive Due Process and Equal Protection claims.

**F.    Claims Under Article I, Section 7 of the California Constitution.**

Plaintiffs have also advanced claims under Article I, Section 7 of the California Constitution. This Court's December 26, 2012 Order explained that there was some authority to support such state causes of action premised upon Plaintiffs' danger creation claim. *See* Doc. 46 at 38.[11] In light of the above rulings, however, Defendants' motion for summary judgment as to Plaintiffs' claims under Article I, Section 7 of the California Constitution is GRANTED.

**G.    Intentional infliction of Emotional Distress Claim.**

The Ninth Claim for Relief is for intentional infliction of emotional distress ("IIED"). SAC ¶¶ 87-90. Under California law, the elements of an IIED claim are: "(1) outrageous conduct by the defendant, (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress, (3) the plaintiff's suffering severe or extreme emotional distress, and (4) actual and

---

[11] The Court notes that it recently identified a California case that appears to narrow the scope of the danger creation doctrine in California to situations in which there is "*both* state action *and* a restraint on the individual's freedom to act...." *O'Dea v. Bunnell*, 151 Cal. App. 4th 214, 225 (2007) (emphasis in original).

proximate causation of the emotional distress by the defendant's outrageous conduct." *Johnson v.*

*Ralphs Grocery Co.*, 204 Cal. App. 4th 1097, 1108 (2012). Defendants move for summary judgment on

Plaintiffs' IIED claim, arguing that the City's conduct cannot be deemed outrageous because:

> AO6-23 was enacted in conjunction with Plaintiffs' counsel in Kincaid; the City agreed
> that the Court possessed jurisdiction for a period of at least 5 years to ensure that the City
> followed its policy. The City received complaints regarding the subject encampments,
> which were located on City property. The City Defendants, with the assistance of other
> agencies/entities, interacted with the persons subject to the clean-ups to provide
> information regarding services, temporary shelter and housing. The City provided notice
> of the clean-ups so that the affected individuals had the opportunity to move their
> property. In fact, the individuals could have continued to sleep in the area at night, as
> long as they took down their shelters each day. Under no circumstances can this conduct
> be deemed to be outrageous.

Doc. 107-1 at 19.

Conduct is outrageous when it is so extreme that it exceeds all bounds usually tolerated in a

civilized society. *Id.* There is no bright line standard for judging outrageous conduct, and a case-by-case

appraisal of conduct is required. *Cochran v. Cochran*, 65 Cal. App. 4th 488, 494 (1998). "Generally,

conduct will be found to be actionable where the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' "

*KOVR-TV, Inc. v. Superior Court*, 31 Cal. App. 4th 1023, 1028 (1995) (internal citations omitted).

"Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities." *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) (internal citations omitted). Whether a

defendant's conduct can reasonably be found to be outrageous is a question of law that must initially be

determined by the court; if reasonable persons may differ, it is for the jury to determine whether the

conduct was, in fact, outrageous. *Berkley v. Dowds*, 152 Cal. App. 4th 518, 534 (2007) (citing *Alcorn v.*

*Anbro Engineering, Inc.*, 2 Cal. 3d 493, 499 (1970)).

Given that "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences

are to be drawn in [their] favor," *Anderson*, 477 U.S. at 255, the Court finds there are material disputes

as to whether the City Defendants' conduct was outrageous. First, the Court rejects Defendants'

argument that the fact the cleanups were conducted pursuant to AO6-23 precludes them from being

outrageous. Although AO6-23 provided a procedure whereby the City could undertake cleanups of homeless encampments, AO6-23 itself prohibited the destruction of valuable property appearing to belong to an individual. AO6-23.IV (B) & (C). Plaintiffs' declarations describe conduct that a reasonable person could conclude violates AO6-23's plain terms. *See* Subia Decl. at ¶ 3 (crews destroyed everything inside her tent "including my clothes, my jewelry, and other property [that] was very valuable to me"); Ward Decl. at ¶ 4 (crews destroyed his tent, which was "intact and zipped closed" and contained his blankets, spare boots, spare clothing, a Sony Walkman, two watches and personal pictures of declarant's family); Soto Decl. at ¶ 4 (crews destroyed her shelter which contained small pieces of furniture, personal effects of declarant's deceased husband, including his crucifix, as well as videotapes of him and their children). This evidence, standing alone, is sufficient to support a finding that a reasonable juror could find the City's conduct outrageous.

Moreover, "[b]ehavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *Hailey v. Cal. Physicians' Serv.,* 158 Cal. App. 4th 452, 474 (2007) (internal citation omitted). Here, it cannot be disputed that the City Defendants had the power to damage Plaintiffs' interests. Likewise, the evidence at least arguably suggests that the City's own P4 survey put the City on notice that that there was insufficient replacement housing available for those homeless individuals who would be displaced by the cleanups, thereby suggesting the City knew Plaintiffs were likely to remain without shelter, which a reasonable person might conclude would render Plaintiffs susceptible to mental distress. *See* Suppl. Declaration of Paul Alexander, Ex. 1, Doc. 164-1 (P4 Survey); Ex. 2, Barfield Depo. 120-123.

Viewed as a whole, the record precludes summary judgment on the outrageousness element of Plaintiffs' IIED claims. Defendants do not challenge Plaintiffs' ability to survive summary judgment as to any other element of this claim. Accordingly, Defendants' motion for summary judgment on Plaintiffs' IIED claims is DENIED.

**H.**    **Plaintiffs Subia's and Ward's Claims Under California Civil Code § 52.1.**

Plaintiffs' eighth claim for relief arises under California Civil Code § 52.1 ("Section 52.1"), the so-called "Bane Act," which permits a private right of action for damages:

> If a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by <u>threats, intimidation, or coercion</u>, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state...

Cal. Civ. Code § 52.1(a) (emphasis added). The December 26, 2012 Order discussed this requirement and whether the First Amended Complaint contained sufficient allegations:

> Although a complaint need not use the statutory terms "threats, intimidation, or coercion," it must allege facts from which the presence of threats, intimidation, or coercion may be inferred. *See Lopez v. County of Tulare*, 2012 WL 33244, *11 (E.D. Cal. Jan. 6, 2012).

> Plaintiff has alleged a large-scale operation in which City of Fresno employees destroyed large numbers of shelters and discarded more than 200 tons of material belonging to homeless persons using heavy equipment. FAC ¶ 21. The FAC essentially alleges two types of threatening conduct. First, Plaintiff suggests that the demolition itself was conducted in a threatening manner because of the number of individuals involved and the use of heavy equipment. "The text of the Bane Act ... indicates that a cause of action under the act requires a predicate—the application of threat, intimidation or coercion—and an object— interference with a constitutional or statutory right." *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D. Cal. 2011). For example, if the object is interference with the right to be free from the use of force or the threat of force, a violation of that right cannot also satisfy the predicate requirement of the application of threat, intimidation or coercion. *Id*. Here, the FAC suggests the cleanups may have been pursued in a manner that was inherently intimidating (i.e. above and beyond that which was necessary to effectuate the cleanup). Although such allegations might, in a general sense, be sufficient to survive a motion to dismiss, the FAC fails to connect each Individual Defendant to the intimidating nature of the cleanups. For this reason, the Individual Defendants' motion to dismiss any Bane Act claim of this nature is GRANTED WITH LEAVE TO AMEND. If amended, amend with provable facts.

> In addition, the FAC alleges that Plaintiff was informed and believed that Fresno Police Department officers threatened some individuals who sought to retrieve their property with arrest. *Id*. The Individual Defendants argue that the "information and belief" of a threat of arrest is insufficient. Doc. 38-9 at 10. However, the FAC also alleges that the knowledge of these threats intimidated Plaintiff and "made him fearful for his safety and of arrest or retaliation should he attempt to recover his property." *Id*. The

> relevant inquiry under the Bane Act "is whether a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendants and have perceived a threat of violence." *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1147 (N.D. Cal. 2010). The FAC contains sufficient factual allegations to suggest a reasonable person would have been intimidated by the FPD Officers' conduct. The problem is: the FAC does not name any individual FPD Officers as Defendants and fails to connect any of the named Individual Defendants to the alleged arrest threats. The moving Individual Defendants' motion to dismiss any Bane Act claim based upon threat of arrest is GRANTED WITH LEAVE TO AMEND.

*Sanchez*, 2012 WL 6719556, * 26 (footnote omitted).

Plaintiffs included a Bane Act claim in the Second Amended Complaint, which was again the subject of a motion to dismiss. This Court's May 14, 2003 Order again addressed the Bane Act's requirement that interference with rights must be accomplished by threats, intimidation, or coercion, noting that the requirement "has been the source of much debate and confusion."

> The December 26, 2012 Decision adopted the position that even where the interference is "with the right to be free from the use of force or the threat of force, a violation of that right cannot also satisfy the predicate requirement of the application of threat, intimidation or coercion," requiring separate proof of threat, intimidation or coercion. *Id.* (internal quotation and citation omitted). However, a recent Northern District of California case has persuasively discussed why the statute does not require a separate showing of coercion in most cases:

>> Bane Act liability extends only to rights violations accompanied by "threats, intimidation, or coercion." *See* Cal. Civ. Code § 52.1; *Venegas*, 32 Cal.4th at 843, 850–51 (Baxter, J. concurring) (characterizing burden of showing "threats, intimidation, or coercion" as minimal: "it should not prove difficult to frame many, if not most, asserted violations of any state or federal statutory or constitutional right, including mere technical statutory violations, as incorporating a threatening, coercive, or intimidating verbal or written component").

>> Defendants here argue that, to adequately allege a Bane Act violation, Plaintiffs must allege "threats, intimidation or coercion" separate and independent from the wrongful conduct constituting the rights violation, citing *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 961 (2012). In *Shoyoye*, a computer error resulted in the unlawful detention of a prisoner that had been ordered released. The *Shoyoye* court held that "the statute requires a showing of coercion independent from the coercion inherent in the wrongful detention itself." That court made clear that the basis of its holding was that plaintiff's evidence showed only that

County employees were negligent in assigning to Shoyoye a parole hold in the computer system, and in failing to detect the error during the subsequent quality control procedure.... Any intimidation or coercion that occurred was simply that which is reasonable and incident to maintaining a jail.

*Id*. Distinguishing [*V]enegas*, the *Shoyoye* court observed that, in the former case, probable cause "eroded at some point, such that the officers' conduct became intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with the plaintiffs' constitutional rights," whereas in the latter, "[t] he coercion was not carried out in order to effect a knowing interference with Shoyoye's constitutional rights." *Id.* Defendants read *Shoyoye* to create a requirement in all Bane Act cases that constitutional interference must be accompanied by "threats, intimidation, or coercion" separate and apart from the rights violation. Although "federal district courts interpreting *Shoyoye* continue to disagree about its significance," *Cardoso v. Cnty. of San Mateo*, 2013 WL 900816 (N.D. Cal. Jan.11, 2013), this Court agrees with other courts holding that, at the pleading stage, the relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct, and that *Shoyoye* applies only when the conduct is unintentional. *See, e.g., Bass v. City of Fremont*, 2013 WL 891090 (N.D.Cal. Mar.8, 2013).

In *Bass*, the court sustained a Bane Act claim where the plaintiff's allegedly unconstitutional "detention and arrest resulted from the officers' action, rather than their inaction." The court concluded that "*Shoyoye* is best viewed as a carve-out from the general rule stated in [*V]enegas*. In *Shoyoye*, the plaintiff's overdetention resulted from the negligent inaction of administrators, whereas in [*V]enegas*, the defendant officer engaged in a series of actions involving 'threats, intimidation, or coercion' that resulted in the plaintiff's unreasonable seizure and wrongful arrest." *Id*. at * 6–7. *See also Holland v. City of San Francisco*, 2013 WL 968295 (N.D. Cal. Mar.12, 2013) (rejecting Defendants' Shoyoye argument because plaintiff alleged intentional, not unintentional, interference with constitutional rights); *Skeels v. Pilegaard*, 2013 WL 970974, at *4 (N.D. Cal. Mar.12, 2013) (distinguishing *Shoyoye* because plaintiff's alleged harms "were not brought about by human error, but rather by intentional conduct, conduct which could be reasonably perceived as threatening, intimidating, or coercive"). *See also Cardoso*, 2013 WL 900816, at * 1 (N.D. Cal. Jan.11, 2013) (denying motion to dismiss based on *Shoyoye* because plaintiff's Bane Act claim "may turn on details about the alleged application of excessive force—details which are unavailable at this early stage in the litigation").

*M.H. v. Cnty. of Alameda*, 2013 WL 1701591 (N.D. Cal. Apr. 18, 2013). This Court adopted this approach in a recent decision. *Dillman v. Tuolumne Cnty.*, 2013 WL 1907379, *19-21 (E.D. Cal. May 7, 2013).

There is no need to disturb the law of the case previously applied to this litigation, as the December 26, 2012 Decision accepted the possibility that a Bane Act claim could be made out if the cleanups were pursued in a manner that was "inherently intimidating (i.e. above and beyond that which was necessary to effectuate the cleanup)." *Sanchez*, 2012 WL 6719556, * 26. The Bane Act claim in the FAC was nevertheless dismissed because it failed "to connect each Individual Defendant to the intimidating nature of the cleanups." *Id.* The SAC does so as to certain Original City Defendants. For example, the SAC alleges Defendant Swearengin "directed the presence of Fresno Police defendants and the use of bulldozers and other heavy equipment." SAC ¶ 14. The SAC contains similar allegations as to Defendants Scott and Rudd. SAC ¶¶ 15 & 16. However, no such connection is made with the other Original City Defendants.

The Municipal Employee Defendants are alleged to have implemented the cleanups. Although the SAC does not indicate that every cleanup used heavy equipment or other techniques that went beyond that which was necessary to effectuate the cleanup, the Plaintiff-specific allegations indicate such techniques were utilized in the cleanups that impacted Joshua Deen and Melissa Ohler, SAC ¶ 38, as well as Gloria Williams, SAC ¶ 48. For pleading purposes, the SAC makes a sufficient connection between the Municipal Employee Defendants and intimidating conduct. Alternatively, the December 26, 2012 Decision indicated the Court would accept evidence of arrest threats made in connection with the cleanups, if Plaintiffs could name individuals who made the threats and connect the remaining Individual Defendants to those threats. *Sanchez*, 2012 WL 6719556, * 26. As described above, the SAC sufficiently alleges that the Police Officer Defendants made arrest threats to several Plaintiffs.

The Additional City Defendants' motion to dismiss is the Bane Act claim is DENIED.

Doc. 81 at 14-17.

Defendants do not move for summary judgment as to any Section 52.1 claim brought by Plaintiff Soto. Defendants do argue that Plaintiffs Subia and Ward cannot establish the requisite threats, intimidation and coercion. Acknowledging that the Court previously found that the Section 52.1 claim in the SAC could survive a motion to dismiss based upon allegations that "the presence of Fresno Police defendants and the use of bulldozers and other heavy equipment," Defendants now argue that there is "simply no evidence" to support the assertion that the "techniques utilized in the clean-ups were unnecessary." Doc. 107-1 at 20. In this way, Defendants make reference to language in the December 26, 2012 order indicating that the requisite "threat, intimidation, and coercion" could be established if

the cleanups were conducted in a manner that was "inherently intimidating (i.e., above and beyond that which was necessary to effectuate the cleanup)." Doc. 46 at 4.

The Court agrees with Defendants that Plaintiff Ward cannot maintain a Section 52.1 claim against the City. He was not present at the time his tent was disposed of, so he could not have witnessed any threatening or coercive conduct that may have taken place at that time. Ward Decl., Doc. 162-3, at ¶ 12. Plaintiffs argue that Ward nevertheless can maintain a Section 52.1 claim because the City created a "threatening and intimidating environment that would undoubtedly produce fear of violence in a reasonable person." Doc. 162 at 27.  But, even assuming this is true, Plaintiff Ward does not indicate he witnessed any intimidating or threatening conduct or that he felt threatened or intimidated by City crews. *See generally* Ward Decl.

Plaintiff Subia's situation is a hair more complex. She claims to have been able to "hear the noise from the City trucks and crews tearing down structures." Subia Decl. ¶ 3.[12] But, no reasonable juror could conclude that the cleanups were "inherently intimidating" vis-à-vis Plaintiff Subia simply because she "could hear the noise from the City trucks and crews tearing down structures." Plaintiff Subia's Section 52.1 claim fails for lack of proof as well.

Defendants' motion for summary judgment as to Plaintiffs Subia's and Ward's Section 52.1 claims is GRANTED.

## V. **PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**

**A.     Summary of Plaintiffs' Motion.**

Plaintiffs move for summary adjudication[13] on four issues:

(1) Whether the conduct at issue in this case constituted the official policy of the City of Fresno;

---

[12] Contrary to the assertion in Plaintiffs' opposition that she could "see" City trucks destroying structures in the area, see Doc. 162 at 27, paragraph 3 of her declaration simply states she could "hear" the trucks and crews at work. *See* Subia Decl. at ¶3. She claims that her husband saw the demolitions, but, even if such evidence was admissible through Plaintiff Subia, her husband's experience is irrelevant to Plaintiff Subia's capacity to maintain a Section 52.1 claim.

[13] While Plaintiffs' motion is styled as a motion for "summary judgment," summary judgment or partial summary judgment is reserved for situations in which "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" on a claim or defense. Fed. R. Civ. P. 56(a). Plaintiff is not moving for judgment on any particular claim or defense. Nevertheless, "[s]ummary adjudication may be appropriate on clearly defined, distinct issues." *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1029 (E.D. Cal. 2002). This motion will be treated as one for summary adjudication.

30

(2) Whether Property belonging to Plaintiffs Soto, Ward, and J. Subia was destroyed;

(3) Whether the City stored Plaintiffs' property and/or provided Plaintiffs with any meaningful

opportunity to recover it; and

(4) Whether any destroyed property was "of value" to the Plaintiff in question.

Doc. 111-1.

**B.     Defendants' Procedural Objections to Plaintiffs' Motion.**

  **1.     Notice of Motion.**

Defendants argue in their opposition that Plaintiffs' motion should be denied because Plaintiffs

failed to file a notice of motion. Doc. 170. This argument is without merit. Plaintiffs did in fact file a

notice of motion. Doc. 111.

  **2.     Separation of Facts By Issue in Separate Statement.**

Defendants next argue that Plaintiffs' entire motion should be rejected because Plaintiffs'

separate statement, which contains eleven (11) factual assertions, does not separate those assertions

according to the issues they seek to adjudicate. However, Defendants point to no such requirement, nor

can the Court locate any such requirement in the Federal Rules of Civil Procedure, the Local Rules, or

the Standing Order entered by the previously assigned District Judge, Doc. 6-1.

  **3.     Failure to Link the Four Issues to Individual Claims.**

While Defendants acknowledge that Plaintiffs' motion identifies four issues, Defendants

complaint that Plaintiffs do not identify the cause of action and/or defense to which they relate.

Summary adjudication may be appropriate on any "clearly defined, distinct issue." *FMC Corp. v. Vendo

Co.*, 196 F. Supp. 2d 1023, 1029 (E.D. Cal. 2002). Where relevant, the Court addresses below whether

the issues articulated by Plaintiffs are clearly defined. There is no separate requirement that issues be

linked to specific claims in the operative complaint.

**C.     Did Defendants act Pursuant to City Policy?**

Plaintiffs first move for summary adjudication that Defendants' allegedly unlawful acts were

undertaken pursuant to official policy. *Monell*, 436 U.S. at 690-91, provides that a municipality cannot

be liable under § 1983 on a *respondeat superior* theory (i.e., simply because it employs someone who deprives another of constitutional rights). Rather, liability only attaches where the municipality itself causes the constitutional violation through a "policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Id*. at 694. Therefore, municipal liability in a § 1983 case may be premised upon: (1) an official policy; (2) a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the act of an "official whose acts fairly represent official policy such that the challenged action constituted official policy"; or (4) where "an official with final policy-making authority delegated that authority to, or ratified the decision of, a subordinate." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008). Plaintiffs advance claims based upon conduct of officials whose acts fairly represent official policy, pattern and practice, and ratification theories.

### 1. <u>Previous Ruling Re:"Official Policy" Monell Claim.</u>

The December 26, 2012 Decision dismissed any pure "official policy" *Monell* claim.

> As part of the *Kincaid* settlement, the City developed AO 6-23 as a formal policy regarding the cleanup of shelters erected by homeless individuals and any belongings found in and around such shelters. AO 6-23 details how the City will provide notice regarding planned cleanup of such structures and belongings, and defines "trash and debris" to include "property that appears to have been discarded by its owner." AO 6-23 at I.A(4). While the AO does not prohibit the City from disposing of such "trash and debris," it specifically prohibits the destruction of "any materials of apparent value which appear to be the personal property of any individual." AO 6-23 at I.A(3). The AO also specifies that "the fact that property is unattended does not necessarily mean that it has been discarded" and that "reasonable doubt about whether property is 'trash or debris' or valuable property should be resolved in favor of the conclusion that the property is valuable and has not been discarded." AO 6-23 at I.A(4).
>
> The FAC alleges that individual agents of the City acted in <u>contravention</u> of AO 6-23. This is indisputably insufficient to trigger municipal liability under *Monell* and Plaintiff offers no other basis upon which this form of liability could exist. Accordingly, City Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND as to any *Monell* claim based on an official policy.

Doc. 46 at 7-8. Therefore, Plaintiffs cannot (and do not attempt to) advance a pure "official policy" claim here.

32

**2.      Conduct of Official Whose Acts Fairly Represent Official Policy.**

Plaintiff argues instead that the removals were conducted at the direction of various high-ranking City officials and that their conduct therefore constituted official City policy. *Price* recognizes that *Monell* liability may exist due to the conduct of an "official whose acts fairly represent official policy such that the challenged action constituted official policy." 513 F.3d at 966. The City interposes a threshold defense to application of the "actions of a final policymaker" standard, arguing that during the relevant time period, no City official had the authority to create new policy. Doc. 161 at 12. The December 26, 2012 Order addressed this issue:

> The FAC alleges that high-ranking policymakers within City government, including the Mayor, the City Manager, the Assistant City Manager, the Chief of Police, and the Homeless Prevention and Policy Manager personally approved of and or directed others to implement a policy very different from that set forth in AO 6-23, one that called for "the demolition of shelters and personal property of great importance to plaintiff and others like him with knowledge of the devastating personal damage caused by these actions." FAC ¶ 9; see also FAC ¶¶ 10-13. For purposes of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), these allegations must be assumed true.
>
> Defendants argue that none of the named individual City officials possesses the authority to set City policy regarding the cleanup of homeless encampments because of the nature of the Settlement Agreement in Kincaid, which gave rise to the passage of AO 6-23. As part of the Settlement Agreement, executed by the City of Fresno, its then Mayor Alan Autry, and several other City Officials, the City agreed that for a period of five years following court approval of the Settlement, the City, as well as all of its agents and employees, must comply with the provisions of AO 6-23 and must not modify AO 6-23 without leave of Court. Settlement Agreement at 3.1.2. The *Kincaid* court approved the Settlement on July 25, 2008.
>
> There seems to be little doubt that the City would be in breach of the Settlement Agreement and the court Order approving it if the City or any of its agents or officers adopted a formal policy contrary to AO 6-23 within the five-year window, which will not expire until July 25, 2013. However, does this necessarily mean that the Mayor lacks authority to do so? Under Section 400 of the Fresno City Charter, the "executive power of the City is vested in the office of the Mayor," who "shall be the Chief Executive Officer of the City..." and "shall be responsible ... for the proper and efficient administration of all affairs of the City." Charter of the City of Fresno, Art. IV, § 400. Further, the City Manager "shall exercise control over all departments, offices and agencies under his or her jurisdiction." Id. at Art. VII, § 705.

The key question in determining whether a person is "a final policymaker" is whether "he or she [is] in a position of authority such that a final decision by that person may appropriately be attributed to the Municipality." *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004).

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Whether the Mayor and/or the City Manger had power to set policy unilaterally on the subject of homeless encampment cleanup would be easier to resolve if the requirement of Court approval prior to modification of AO 6-23 had been embodied in AO 6-23 itself or in any other City Ordinance or Order. As it stands, it is debatable whether the court Order approving the Settlement actually modifies the Mayor's otherwise obvious power to set policy regarding garbage collection and City cleanup activities, or whether the Mayor may still exercise that power despite the fact that doing so may violate a federal court Order. The Court is unable to conclude at this stage of the litigation that the Mayor and/or other Individual Defendants were not final policymakers. Further factual development appears necessary to resolve this matter.

Accordingly, Defendants motion to dismiss any *Monell* claim based upon the act of a final policymaker is DENIED.

Doc. 46 at 11-12.

Plaintiffs entirely fail to address the language of the Settlement Agreement and/or whether the court Order approving the Settlement modifies the power of the City's executive branch (i.e., the Mayor and her deputies) to set policy regarding the cleanup activities. Therefore, Plaintiffs fail to address a key aspect of a *Monell* claim based upon the "conduct of official whose acts fairly represent official policy" -- namely, whether "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur*, 475 U.S. at 481. Because Plaintiffs bear the burden of proof to establish *Monell* liability, *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"), Plaintiffs' motion for summary judgment that *Monell* liability may be established by virtue of

conduct of an official whose acts fairly represent official policy (i.e., a final policymaker) is DENIED.[14]

### 3. Ratification.

Plaintiffs also maintain that City Officials ratified the allegedly unlawful conduct. Doc. 111-1 at 11. To show ratification, a plaintiff must prove that an "<u>authorized policymaker</u>[] approve[d] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)) (emphasis added); *see also Lytl*e, 382 F.3d at 987.

> There must, however, be evidence of a conscious, affirmative choice on the part of the <u>authorized policymaker</u>. A local government can be held liable under § 1983 only where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (internal citations and quotations omitted)(emphasis added).

Because Plaintiffs have failed to establish (or even address) whether the Mayor and her deputies retained authority to set policy in light of the Settlement Agreement and related court Order, Plaintiffs are not entitled to summary judgment as to any ratification theory.

### 4. Pattern & Practice.

Plaintiffs also maintain that the cleanups took place as part of a widespread and continuing practice. Doc. 111-1 at 11. To prevail on a pattern and practice claim, plaintiff must prove "the existence of a widespread practice that ... is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (quoting *Praprotnik*, 485 U.S. at 127). Evidence of one or two prior incidents does not raise a triable issue as to whether there was

---

[14] The Court acknowledges that resolution of this issue may turn out to be a pure question of law, based upon undisputed facts related to the powers of the Fresno Mayor vis-à-vis the Settlement Agreement. But, the movant has the burden on summary judgment to establish "that there is no genuine dispute as to any material fact and the movant is <u>entitled to judgment as a matter of law</u>." Fed. R. Civ. P. 56(a)(emphasis added). Plaintiffs have failed to meet this burden here, and, in light of this failure, the Court, one of the busiest in the nation, declines to address the numerous other arguments raised by the parties pertaining to Plaintiffs' "conduct of an official whose acts fairly represent official policy" and "ratification" theories. This does not mean the issue must wait to be resolved at trial; only that Plaintiffs have failed to meet their burden in this motion.

1    a "pattern and practice" of unconstitutional conduct. *See Meehan v. County of Los Angeles,* 856 F.2d

2    102, 107 (9th Cir. 1988).

3        Plaintiffs argue that this standard is satisfied because the cleanups occurred as part of a

4    continuing practice, implemented over multiple days in October, November, and December. According

5    to the evidence presented by Plaintiffs, Julia Subia's shelter and personal property was destroyed on

6    November 2, 2011; Angelita Soto's on November 7, 2011; and Steven Ward's on November 8, 2011. In

7    each case, Plaintiffs maintain that the City followed the same procedures. Even assuming, *arguendo,*

8    that three instances could ever form a "widespread" pattern, Defendants have introduced contrary

9    evidence that, if believed, demonstrates that, while cleanups certainly took place on these three dates, no

10   "custom" or "pattern and practice" of <u>unconstitutional conduct</u> (e.g., to immediately destroy valuable

11   property) ever existed.

12       For example, James Betts, counsel of record for the City,[15] explains in his Declaration that he

13   was present when the temporary shelters claimed by Plaintiffs Soto and Ward were dismantled by the

14   City. Betts Decl., Doc. 161-8, at ¶ 16. With respect to Plaintiff Soto's shelter, following a "standard

15   protocol," he inspected the temporary shelters, observed that the shelter was "essentially stripped bare"

16   except for a few items of clothing being collected by a Hispanic male. *Id.* at ¶ 20. Mr. Betts observed a

17   few items of furniture that "were in such deteriorated condition that [he] would not have directed City

18   crews to store them." *Id.* Among these items of furniture was a "black vinyl sofa located inside the

19   shelter ... which had a strong odor of urine." *Id.* Consistent with the City's practice of not storing

20   contaminated items, the City did not store the sofa. *Id.* Mr. Betts did observe a "red ice chest" inside the

21   shelter which he "thought could be used again," so he moved it outside the shelter "to be collected and

22   stored by City crews." *Id.* Likewise, with respect to the tent claimed by Plaintiff Ward, Mr. Betts

23   examined the interior of the tent for any personal property of value and found it "virtually empty,"

24   except for "scattered trash and a heavily soiled blanket or sheet that smelled strongly of urine." *Id.* at ¶

25   ────────────────

26   [15] The Court is aware of the potential ethical implications of calling counsel as a trial witness. The parties are
     ADMONISHED to raise any such issues well in advance of trial.

28. Mr. Betts further observed that the tent "was ripped, torn and the tent poles were bent and broken." *Id.* at ¶ 29. With this in mind, Mr. Betts confirmed that it "could not reasonably be used again," so he "approved its removal." *Id.*

Plaintiff Subia claims to have been using a shelter located adjacent to the Fresno Rescue Mission on the north portion of G Street partially under the freeway overpass. *See id.* at ¶ 32 (citing Subia Depo. at 15:6-15, 118:10-119:15). Plaintiff Subia asserts City crews destroyed this shelter. Subia Decl., Doc. 162-2, at ¶ 3. Mr. Betts observed, however, that, although the City did conduct a cleanup on G Street on November 2, the cleanup was "limited to collecting a very limited number of clearly vacated and abandoned shelters, which did not contain personal property of value." Betts Decl. at ¶ 33. He also states that the City's cleanup efforts ended approximately one hundred yards south of where Plaintiff Subia claims her shelter was located. *Id.* Perhaps most importantly, Mr. Betts points out that the location of her claimed shelter was on State property, subject to clean-up by CalTrans, a State agency, not the City. *Id.* On this record, the Court cannot rant summary adjudication in favor of Plaintiff on Plaintiff's theory that the City is liable under *Monell* based on a longstanding practice or custom. If Defendants' evidence is credited, which it must be in evaluating Plaintiffs' motion, there were zero instances of unlawful conduct, and zero does not a pattern make.

Plaintiffs' motion for summary adjudication that the conduct at issue constituted the official policy of the City is DENIED.

**D.**    **Remaining Requests for Summary Adjudication.**

Plaintiffs also move for summary adjudication of three additional issues:

(1) "that property belonging to them was in fact destroyed during the demolitions";

(2) "that their property was not stored by the City of Fresno and that the City did not provide them with any meaningful opportunity to recover their property"; and

(3) that the property in question was "of value" to Plaintiffs at the time of its destruction. Doc. 111-1 at 2-3.

As the Betts Declaration (described above) reveals, it is disputed whether the City destroyed any

"property" claimed by Plaintiff Subia. Therefore, Plaintiffs' motion for summary adjudication that property belonging to Plaintiff Subia was in fact destroyed during the demolitions is DENIED.

As to Plaintiffs Soto and Ward, Plaintiffs fail to specifically identify the nature of the "property" they claim was destroyed by the City. Summary adjudication is only appropriate on "clearly defined, distinct issue[s]." *FMC Corp*, 196 F. Supp. 2d at 1029. While it is undisputed that the City disposed of (without storing) <u>some items</u> that could generally be described as "property" claimed by Plaintiffs' Soto and Ward, such a generic finding would be so lacking in specificity as to be meaningless. It does not appear that Plaintiffs request a finding that the City destroyed "personal property of apparent value," as that term is defined in AO6-23, given that Plaintiffs separately request a finding that the destroyed property was "of value." Plaintiffs make no effort to clarify this request in their reply. Yet, it is clear that AO6-23 draws a distinction between "personal property of apparent value"[16] and "trash,"[17] both of which could be generally described as "property." Plaintiffs' failure to acknowledge this distinction or to specifically define the meaning of "property" in their request renders this aspect of their motion insufficiently specific as to Plaintiffs Soto and Ward. Therefore Plaintiffs' motion for summary adjudication that "property" belonging to Plaintiffs Soto and Ward was in fact destroyed during the demolitions is DENIED.[18]

The same problem plagues Plaintiffs' request for adjudication that "the property was not stored by the City of Fresno and that the City did not provide them with any meaningful opportunity to recover their property." Even if this request were sufficiently specific, Plaintiffs do not even assert that their

---

[16] AO6-23(I)(A)(3) provides: "[p]ersonal property of apparent value may include clothing, shoes, jackets, tents, sleeping bags, bed rolls, blankets, backpacks, duffel bags, bicycles, tools, watches, jewelry, audio and video equipment, medications, toiletries, eyeglasses, purses, handbags, personal papers, equipment, photographs, books and baby strollers."

[17] AO6-23(I)(A)(4) provides: "[t]rash and debris includes property that appears to have been discarded by its owner, but the fact that property is unattended does not necessarily mean that it has been discarded. Reasonable doubt about whether property is 'trash or debris' or valuable property should be resolved in favor of the conclusion that the property is valuable and has not been discarded."

[18] The Court notes that Plaintiffs do not claims it was unlawful for the City to destroy or fail to store "property" belonging to Plaintiffs, only that it is unlawful to destroy "valuable personal property" without first affording Plaintiffs opportunities to claim any such "valuable personal property." *See, e.g.*, SAC ¶ 1 ("This action arises out of the actions of defendants and of the City of Fresno in developing and implementing a continuing policy, plan and practice in and on behalf of the City of Fresno toward homeless residents, including plaintiffs, that included seizing and immediately destroying the valuable and essential personal property of plaintiffs, including property necessary for their survival, property essential to their health, and property of enormous personal and emotional sentimental value that cannot be replaced....").

property was stored. Rather, all Plaintiffs maintain their property was immediately destroyed by

Defendants. Doc. 170 at 11 (conceding that "something that is destroyed clearly cannot be stored").

Therefore, this inquiry is not relevant to any pending claim. Summary adjudication allows the court to

"ascertain what <u>material</u> facts exist without substantial controversy and what material facts are actually

and in good faith controverted...." *Id.* at 1029-30, citing 10A Charles A. Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice and Procedure (3d ed.1998), § 2737 at 316-18 (emphasis added).

Plaintiffs' request for adjudication that "the property was not stored by the City of Fresno and that the

City did not provide them with any meaningful opportunity to recover their property" is DENIED.

The final issue for which Plaintiffs seek adjudication is whether the property in question was "of

value" to any Plaintiff. This is framed as a purely subjective inquiry, but Plaintiffs have made no effort

to establish that a subjective inquiry is appropriate under the applicable legal framework. AO6-23

speaks of property of "apparent value" and provides the following definition:

> Personal property of apparent value may include clothing, shoes, jackets,
> tents, sleeping bags, bed rolls, blankets, backpacks, duffel bags, bicycles,
> tools, watches, jewelry, audio and video equipment, medications,
> toiletries, eyeglasses, purses, handbags, personal papers, equipment,
> photographs, books and baby strollers.

AO6-23(I)(A)(3). Even assuming, *arguendo*, that a subjective inquiry is appropriate, there are material

factual disputes as to whether anything of "value" was in fact destroyed by the City. *See* Betts

Declaration (describing in detail his inspection of the shelters claimed by Plaintiffs Soto and Ward and

his explanation that the City did not clean-up the area in which Plaintiff Subia's shelter and/or

belongings were located). Plaintiffs' request for adjudication that the property in question was "of

value" to Plaintiffs at the time of its destruction is DENIED.

## VI. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above:

(1) Defendants' motion for summary judgment is:

    (a) GRANTED as to Plaintiffs' Substantive Due Process claims;

    (b) GRANTED as to Plaintiffs' Equal Protection Claims

(c) GRANTED as to Plaintiffs' claims under Article 1, Section 7 of the California

Constitution;

(d) DENIED as to Plaintiffs' IIED claim; and

(e) GRANTED as to Plaintiffs Subia's and Ward's Claims Under California Civil Code §

52.1; and

(2) Plaintiffs' motion for summary judgment, construed as a motion for summary adjudication, is

DENIED IN ITS ENTIRETY.


IT IS SO ORDERED.

Dated:   **May 16, 2014**                                  **/s/ Lawrence J. O'Neill**
                                                   UNITED STATES DISTRICT JUDGE